(121 So. 576)

No. 28906.

## HENDERSON v. UNITED STATES SHEET & WINDOW GLASS CO.

Feb. 25, 1929. Rehearing Denied March 25, 1929.

· Wilkinson, Lewis & Wilkinson, of Shreveport, for appellant.

Pugh, Grimmet & Boatner, J. N. Marcantel, and Fred Simon, all of Shreveport, for appellee.

O'NIELL, C. J. The plaintiff sued for a balance due on the price of 600 tons of chip box window glass cullet, sold to the defendant. Window glass cullet is the refuse from trimming sheets of glass in the factory. The trimmings, or chips of glass, are thrown into a box called the "chip box"—hence the term "chip box cullet." It is afterwards put through a crusher and remelted and made into window glass. Every window glass factory, therefore, has an accumulation of cullet. The Continental Glass Company, at Cedar Grove, near Shreveport, had a pile exceeding 600 tons of chip box cullet, when the plant was destroyed by fire. The defendant, United States Sheet & Window Glass Company, has a manufacturing establishment at Jewella, just outside of Shreveport; and the superintendent of the plant, knowing of the pile of cullet for sale at Cedar Grove, ordered one carload, approximately 35 tons, and used it in the manufacture of window glass. Two months afterwards defendant bought the remainder of the pile of cullet, described in the order as "approximately 600 tons clean chip box window glass cullet, free from dirt, colored or silvered glass, metals or foreign matter of any kind." The price stipulated was $12 per ton, delivered at the buyer's plant. Three carloads, containing 101½ tons of the cullet, were received by the defendant and paid for; but, after using about one-third of a carload, the defendant claimed that the cullet produced an inferior quality of glass, and was therefore not fit for the manufacture of window glass; and, tendering the remainder of the three carloads of cullet, the defendant demanded a cancellation of the contract.

After making demand for shipping instructions for the remainder of the 600 tons of cullet, the receiver for the Continental Flat Glass Company brought this suit for $5,982, the unpaid part of the price. The defendant pleaded "that, instead of the said plaintiff selling it such clean chip box window glass cullet as ordered, the cullet which it received was so defective, for some reason unknown to your defendant, that it was unable to use the same in its plant;" that it believed that it was because of a "low lime content and high soda content" that the cullet was not fit for manufacturing window glass; and that when the cullet was used in admixture with the defendant's own cullet, which was perfectly good, "it produced a cordy or smeary glass, which was of little or no commercial value." The defendant therefore prayed for the dismissal of the plaintiff's suit, and for a judgment against the plaintiff for the amount which defendant had paid for the three carloads of cullet.

While the suit was pending, the plaintiff received an offer of $5.75 per ton for the remainder of the 600 tons of cullet, where it

was, and, after notifying the defendant and demanding instructions, sold the cullet and credited the defendant with the price, plus $1 per ton for what it would have cost to load the cullet on cars and switch it over to defendant's plant. The court gave judgment in favor of the plaintiff for $2,617.12½, for the difference in price, $5.25 per ton, for 498½ tons. The defendant has appealed from the decision.

The evidence does not convince us that the trouble which the defendant experienced while using the cullet bought from the plaintiff was due to a defect in the cullet. The testimony was that atmospheric conditions might have caused the trouble, and that there were other conditions which might have caused the failure to make good glass during the period of about 16 hours in which the cullet bought from the plaintiff was being used. The carload which the defendant bought and used successfully, two months before, came from the same pile, and was of the same quality and composition as that which was afterwards complained of. It is not possible to reconcile the testimony given on behalf of the defendant, in that respect, with the undisputed fact that the defendant bought the cullet after using a whole carload of it as a sample, or with the undisputed fact that the remaining pile of 498½ tons of the same cullet was afterwards sold to the Harding Glass Company, at Ft. Smith, Ark., at a price which, when added to the freight charges, was 25 cents a ton higher than the price which defendant had agreed to pay for the cullet delivered, and it was being used by the Harding Glass Company, at the rate of 45 tons a week, in the manufacture of window glass, and without complaint, when this suit was in progress.

Assuming, however, that the trouble which the defendant experienced at the beginning of the using of cullet from one of the three carloads was due to a defect in the chemical composition of the cullet, it means or amounts to nothing more than that the chemical composition was not suitable for the defendant's process of manfacturing window glass, but was suited to the plaintiff's process, and to the Harding Glass Company's process, and perhaps to other processes of manfacturing window glass. The testimony discloses that there are many different processes of manfacturing window glass, and that each manufacturer tries to make a secret of his process. The defendant's chemist, and other witnesses who testified that this cullet contained too much soda, or sodium oxide, and not enough lime (calcium plus magnesium), to be suitable for manufacturing window glass by the defendant's process, admitted that the composition of the cullet was suitable for other standard processes of manufacturing window glass.

It is not disputed by any of the witnesses that the cullet which was sold, and of which three carloads were delivered, was what is known in the trade as "clean, chip box, window glass cullet." It is not contended that the cullet was not "free from dirt, colored or silvered glass, metals, or foreign matter of any kind." Some of the witnesses for the defendant said that the cullet had lumps in it, and the defendant's chemist said that it was not "one hundred per cent" chip box cullet, but they did not pretend that the lumps of glass were not as good as the chips of glass. In fact it was virtually admitted that every large quantity of chip box window glass cullet has some lumps of glass in it, and that that is not a defect in the cullet. Some of the witnesses for the defendant said that the cullet which was used by defendant from the three carloads was "off color," or of a bluish color; but it was proven, and not denied, that a bluish color is not only not deemed a defect in window glass cullet, but is very much preferred by some manufacturers. It was also admitted by the witnesses for the defendant, who said that the cullet was off color, that the

"off color" could be observed by a simple inspection of the cullet in the car, or in the original pile, which was very near the defendant's plant. The defendant, therefore, could not have been deceived as to an off color in the cullet, and, if there was an off color, and if it was a defect, it was not one for which the defendant could find fault after buying the cullet with ample opportunity for inspection.

The factory manager and the chemist, as witnesses for the defendant, testified that there was a standard chemical composition for window glass cullet, known to the trade; but the requirements which they stated, as to lime content and soda content, were not far off from the proportions stated in the analysis which the chemist made of the sample taken from one of the three carloads of cullet which were delivered to the defendant. The factory manager testified that the lime content should be not less than $17\frac{1}{2}$ per cent., which is all that we can understand of what he calls a standard composition of window glass cullet. The chemist testified that the silica content should be not less than 69 or more than 73 per cent., that the lime content should be not less than 11 or more than 16 per cent., and that the alkali content should be not less than 11 or more than 15 per cent. The analysis which he made, of the sample taken by him from one of the three carloads of cullet, while this suit was pending, showed: Silica 72.63, lime (calcium plus magnesium) 9.59, and sodium 16.49 per cent. The only ingredient, therefore, that was out of proportion, according to the chemist's so-called standard, was the lime content, which was only 1.41 per cent. below the minimum stated in the chemist's so-called standard. The chemist and other witnesses for the defendant admitted that the low lime content in the cullet could be rectified in the mixture used in the manufacturing process. Their only complaint in that respect was that, although it would be not expensive in other processes, it would be so expensive as to be unprofitable in the defendant's process of manufacturing window glass, to change the mixture so as to remedy the alleged defect in the chemical composition of this cullet. A sufficient answer to that complaint is that the plaintiff did not warrant that this cullet would be suitable for the defendant's process of manufacturing window glass. It is true that the plaintiff knew that the cullet was intended to be used in the manufacture of window glass, but the plaintiff knew also that the cullet was suitable for manufacturing window glass by the only standard process known to the plaintiff. It was the defendant's duty to ascertain, when there was ample opportunity to ascertain, whether the cullet was suitable for the defendant's process of manufacturing window glass. When a seller has delivered to the buyer the article specified in the contract of sale, under a definite description, there is no implied warranty on the seller's part that the article is fit for the purpose intended, even though he knew of the purpose for which the article was bought. Dreyfus v. Lourd & Co., 111 La. 21, 35 So. 369; De Witt v. Berry, 134 U. S. 306, 10 S. Ct. 536, 33 L. Ed. 896; 35 L. R. A. (N. S.) 286, 287; 35 Cyc. 400–401.

Appellant's counsel urge, in their brief, that the plaintiff is not entitled to a judgment in this case, because, after bringing the suit for specific performance of the contract, plaintiff "has disregarded the defendant's rights in the matter and has sold all of this cullet to a concern in Fort Smith, Arkansas." The plaintiff did not disregard the defendant's rights in the matter, but, on the contrary, notified the defendant that the cullet would be sold at the price offered and stated, unless the defendant objected. We judge from the record in this case that there is not always a ready market for the sale of window glass cullet, especially in such a large quantity as the plaintiff had. It was therefore not only the

plaintiff's right to protect itself, but was also the plaintiff's duty to protect the defendant, by disposing of the cullet at the best price obtainable. It is true that the suit was originally, in one sense, a suit for specific performance of the contract of sale, but it was primarily a suit for the price of goods sold and tendered for delivery. There was nothing inconsistent, therefore, in the plaintiff's disposing of the goods at the best price obtainable, and giving the defendant credit for the proceeds of the sale, after the defendant had finally refused to accept the goods.

The judgment is affirmed.