TALIAFERRO, Judge.
On August 29, 1949, plaintiff sold to ■defendant 302 bushels of Elberta peaches, then in cold storage in the City of Shreveport, Louisiana, for the price of Five Hundred ($500.00) Dollars, in payment of which defendant and his wife signed check in plaintiff’s favor, on a bank in Bossier City, Louisiana. For reasons as shall hereinafter be recited, defendant had payment of the check stopped and this suit for the price of the peaches was soon thereafter filed.
Defendant denies liability for the price of the peaches. He avers that because of the faulty condition thereof they were un-merchantable; were finally seized and condemned by the Health Department of the State, as being unfit for human consumption, and destroyed.
Defendant alleges that the peaches were guaranteed to him by the seller as being Grade I in quality and after. learning their true condition, by telephone he called the plaintiff and rescinded the sale, and thereafter instructed the bank on which the .check was drawn, to refuse payment thereof. He reconvened and sued for judgment against plaintiff for $362.98.
Plaintiff prevailed below and was awarded judgment for the amount for which he sued. Defendant appealed.
The peaches in question had been in cold storage in Shreveport, to defendant’s knowledge, for some thirty days before they were sold to him. He also had peaches of his own stored in the same place for the same period of time. He had frequently seen the peaches of plaintiff, while stored. They were in one-bushel hampers.
Plaintiff, who lives in Gilmer, Texas, accompanied by his assistant, C. E. Stephens, came to Shreveport on August 29, 1949, in the hope of promptly disposing of the peaches as they had -been in storage so long. He had tentatively agreed to sell them to a merchant in Longview, Texas, but decided to try to'dispose of them locally, fearing the trip to Longview would damage them. Someone referred him to the defendant, who, for several years, has been engaged in, retailing peaches in Shreveport. He was contracted by plaintiff and they discussed a sale of the entire lot. In the course of their conversation *661 plaintiff told defendant why he preferred not to haul the peaches to Longview. Plaintiff asked $600.00 for them, but defendant declined to purchase at this price. He suggested to plaintiff that two bushels (one from each of the two lots) be brought to his place of business for examination. This was promptly done. Defendant made thorough examination of them, ate a portion of one peach from each hamper, and offered $500.00 for the entire lot. Plaintiff, at first, demurred to the offer, but finally accepted same. The check was then issued and delivered. The two hampers were sold within a few minutes. Plaintiff and defendant then went to the cold storage and took out five or six more hampers. Defendant removed the tops from these hampers, made a cursory examination of the contents and testified they looked “nice”.
The two lots of peaches were then transferred at the cold storage to defendant’s account. This all transpired on August 29th.
Additional hampers were brought to defendant’s place of business as he testified that he sold about twenty of them at a price of from $2.50 to $3.50.
Defendant gave the names of several persons to whom he sold hampers of the peaches, but, excepting one instance, he did not by any sort of evidence, support his •own testimony that most of the peaches sold were returned to him because of their bad •condition. These purchasers all lived in :Shreveport, not many miles from the parish seat of Bossier Parish, where the case was tried. He testified that after -complaints about the peaches’ condition were made to him by patrons to whom he had sold them, he, on or about the first ■of September, carried the matter' to the local Board of Health. Mr. Edwin B. Nolan, of this Board, testified that defendant brought to his office some peaches :and stated that he had received complaints ■from his patrons as to their condition. 'They were 'broken open and he said: “The peaches were brown.” Nolan then reported the matter to Dr. Sandidge, Director of the Unit, who called the State Board •of Health in New Orleans, and asked for instructions how to proceed in the case. He says that Dr. Sandidge was advised by a Mr. Menendez “to have the samples picked up and submit them to the laboratory down there for examination.” He then went to the cold storage and, he says: “got what we say was a representative sample”, and sent them to the Board in New Orleans. He produced what purported to be the Board’s report on the condition of the samples sent to it, but on objection by counsel for plaintiff, it was excluded from evidence. However, with the report as authority, the entire lot of peaches, without further ado or notice to plaintiff, was destroyed. This was on September 6th. Neither Dr. Sandidge, Mr. Menendez nor anyone else connected with the State Board of Health, was tendered as a witness. The report was excluded from evidence because neither the person who made it, nor anyone who had any part in making it, offered to testify as to its correctness.
On August 30th and 31st defendant ’phoned to plaintiff and advised him that the peaches were ruining on his hands and requested him to come over and make adjustments. He did not do so.
It is certain plaintiff did not misrepresent the condition of the peaches. They were not represented as being No. I U.S., according to the formula for grading fruit of this kind. Anyway, defendant has had extensive experience in buying and selling peaches and had ample opportunity to determine for himself the grade and condition of the peaches. The fact that not all of his patrons complained to him about the fruit’s condition is strong evidence that all of them were not unmerchantable. As said heretofore, defendant had been seeing the peaches in cold storage since they were first left there. The fact that they had been in cold storage thirty days did not necessarily militate against their good condition. Defendant, himself, had peaches there for the same length of time.
It is shown that a peach that remains in cold storage for thirty days loses some of its original fine flavor; and it is also shown, even by defendant, that the sample eaten by him, did not taste as well as it *662 would have had it been only a few hours from the tree. Because of this taste, plaintiff dropped his asking price $100.00. It is also shown that grade I U.S. peaches were 'being sold at the time by the producers at a price very much in excess, of $1.65 per bushel, the price defendant agreed to pay for those in controversy. He undoubtedly believed he was driving an excellent bargain in acquiring the peaches and was willing to take some chances in the deal. It is certain he had the opportunity to have closely examined each hamper before closing the trade.
We are without positive information concerning the real condition of the samples sent to New Orleans, and the difference in their condition when sent and when received there.
Concededly, defendant bases his defense upon the Articles of the Civil Code that have to do with redhibition, which is defined as fallows : “Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.” Civil Code Article 2520.
Article No. 2521 reads: “Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices.”
And, Article No. 2522 reads: “The buyer can not institute the redhibitory action, on account of the latent defects which the seller has declared to him before or at the time of the sale. Testimonial proof of this declaration may be received.”
These articles, especially No. 2521, have been the subject of judicial interpretation many times. The case of Rocchi v. Schwabacher & Hirsch, 33 La.Ann. 1364, is typical. That case involved a large shipment of lard. Justice Poche, organ of the Supreme Court, quoted with approval, as controlling of the issue therein tendered, the following excerpt from the case of Slaughter’s Administration v. Gerson, 13 Wall. 379, 20 L.Ed. 627, viz:
“ ‘The misrepresentations which will vitiate the contract of sale, and prevent a court of equity from aiding its enforcement, must relate to a material matter, constituting an inducement to the contract, and respecting which the complaining party did not possess at hand the means of knowledge; and it must be a misrepresentation, upon which he relied, and by which he was. actually misled to his injury.
“ ‘Where the means of knowledge are at hand, and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say, in impeachment of the contract of sale, that he was- deceived by the vendor’s misrepresentations.’ ”
The Court then cited, as supporting these-principles, the following cases, to-wit: Decuir v. Packwood, 5 Mart., O.S., 300, 306; Clarke v. Lockhart, 10 Rob. 5; Huntington v. Lowe, 3 La.Ann. 377, 379; Szymanskl v. Urquhart, 5 La.Ann. 491; Holland v. Toole, 6 La.Ann. 426; Mure v. Donnell, 12 La.Ann. 369.
Later cases following the same principles;, are: Henderson v. United States Sheet & Window Glass Co., 168 La. 66, 121 So. 576; Great Eastern Oil & Refining Co. v. Bullock, 151 La. 209, 91 So. 680; G. J. Deville Lumber Co., Inc. v. Jaubert, 19 La.App. 48, 139 So. 502.
In conclusion, it is only necessary to add that defendant purchased the peaches-with “his eyes open”. Their condition was not misrepresented to him. If he had not been willing to take some chances, in the hope of making comparatively large profits from the deal, it would not have been closed; and, consequently, plaintiff would have had the chance to sell the peaches to others.
For the reasons herein assigned, the judgment from which appealed, is affirmed' with costs.