273 So.2d 818 (1972)
Del CRYER
v.
M & M MANUFACTURING COMPANY, INC.
No. 51807.
Supreme Court of Louisiana.
October 4, 1972.
On Rehearing February 19, 1973.
*819 Tucker, Martin, Holder, Jeter & Jackson, T. Haller Jackson, Jr., Shreveport, for defendant-applicant.
Gamm, Greenberg & Kaplan, Jack H. Kaplan, Shreveport, for plaintiff-respondent.
SANDERS, Justice.
This case raises the question of whether a sale of manufacturing rights to a multipurpose heater should be rescinded upon the demand of the purchaser, because of a deficiency in the performance of the manufactured heater. The Court of Appeal upheld the sale. 253 So.2d 69. We affirm.
The facts are largely undisputed. Del Cryer, a Shreveport oil operator, acquired from the inventor the manufacturing rights to the "JET-Glo Multi Purpose Heater," described in a pending patent application. He also acquired a small stock of parts and dies for the heater at a judicial sale. Subsequently, he retained the Greene Research Engineering Company, operated by George J. Greene, Jr., a mechanical engineer, to improve and test the heater for orchard heating purposes. After making improvements and testing, the Greene Research Engineering Company made a written report to Cryer that the maximum burning rate of the heater, using kerosene as fuel, was 275,000 BTUs per hour, suitable for use by outdoor laborers, for preventing fruit and vegetables from freezing, and for protecting newly poured concrete. *820 The report stated that the tests extended over two 24-hour periods.[1]
After receiving the report, Cryer contacted Thayer T. May, president of M & M Manufacturing Company, Inc., concerning the manufacture of the heater. On July 3, 1965, Cryer delivered the model heater and the Greene report to May, suggesting that he satisfy himself about the performance of the heater and determine whether or not he desired to acquire the manufacturing rights.[2] May demonstrated the heater to numerous fruit and vegetable growers to determine its marketability.
On August 17, 1965, by written contract, M & M Manufacturing Company, Inc., purchased the manufacturing rights to the heater from Cryer. M & M paid Cryer $12,500 in cash and agreed to pay him a royalty of $1.25 for each unit manufactured. In the sale, M & M obligated itself to manufacture a minimum of 5000 units in the first year. The sale contained no express warranty as to the capacity of the heater or its suitability for orchard heating.[3]
M & M manufactured an initial group of some fifty heaters. In testing the fuel system on one of these units, M & M discovered that the heater accumulated soot so badly that in three to five hours it failed to produce sufficient heat to protect vegetation. Ultimately, the heater would go out completely.
M & M then made extensive efforts to correct the soot problem, but failed. Although possessing some utility, the heater fell short of the long-burning feature needed for a superior orchard heater. Thus, considering it unmarketable, M & M abandoned its plan to manufacture the heaters.
At the end of the initial contract year, Cryer brought the present suit for royalties and attorney's fees due him under the contract. M & M reconvened, seeking rescission of the sale on the grounds of error, failure of cause, and redhibitory vice.
After trial on the merits, the district judge found that the heater was unsuitable for orchard heating and so imperfect that it must be supposed that a buyer would not have purchased it had he known of the defect. *821 He denied redhibition, however, because M & M could not return the parts and dies delivered in the sale. Under Louisiana Civil Code Article 2543, he reduced the purchase price $6,250.00, the amount of the first year's royalty. On appeal, the Court of Appeal denied the reconventional demand for rescission of the sale and granted judgment in favor of the plaintiff against M & M Manufacturing Company in the sum of $6,250.00, the royalty on the guaranteed minimum of 5000 heaters for the first year, with legal interest from judicial demand until paid, and all costs. It rejected plaintiff's demand for attorney's fees. 253 So.2d 69. On application of M & M Manufacturing Company, Inc., we granted certiorari to review the judgment of the Court of Appeal denying rescission of the sale. 259 La. 1053, 254 So.2d 463 (1971).
Redhibition is the avoidance of a sale because of a vice or defect in the thing sold. LSA-C.C. Art. 2520. It is based upon an implied-in-law warranty that the thing sold is free of hidden defects that render it useless or impair its use to such an extent that it must be supposed that the buyer would not have purchased it, had he known of the vice. LSA-C.C. Arts. 2475, 2476, 2520; 23 Tul. L.Rev. 120.
As correctly noted by the Court of Appeal, the contested contract is a sale of the right to manufacture and distribute a heater built according to a design protected by patent law. The thing sold was an incorporeal right. LSA-C.C. Art. 460; Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956); Yiannopoulos, Louisiana Civil Law Treatise: Property § 13, pp. 33-34 (1967).
In the sale of an incorporeal right, the implied warranty includes existence of the right at the time of the transfer and peaceable possession of that right. LSA-C.C. Arts. 2501, 2646; Tomlinson v. Thurmon, 189 La. 959, 181 So. 458 (1938). It does not extend to a deficiency in a physical object to which the right may ultimately relate. The thing sold and warranted is the right, not the object. Ratcliff v. Mc-Ilhenny, 157 La. 708, 102 So. 878 (1925); 2 Planiol Civil Law Treatise (Translation by Louisiana State Law Institute) No. 1629, p. 904. See also Losecco v. Gregory, 108 La. 648, 32 So. 985 (1901); Succession of Mahoney, 167 La. 255, 119 So. 40 (1928); Benner v. Van Norden, 27 La. Ann. 473 (1875).
We conclude that redhibition is unavailable in the present case because of the absence of warranty extending to the performance of the manufactured heater.
M & M advances two additional reasons for rescinding the sale: error and failure of cause. Although the arguments are variously phrased, the pervasive issue is whether the sale should be rescinded because of error.
As to error, the Louisiana Civil Code provides:
Article 1823:
"Errors may exist as to all the circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, which was a principal cause for making the contract, and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself."
Article 1825:
"The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration without which the contract would not have been made."
Article 1826:
"No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause *822 of the agreement, or unless from the nature of the transaction it must be presumed that he knew it."
In these articles, cause is identified with motive. Litvinoff, Louisiana Civil Law Treatise: Obligations § 290, pp. 522-523 (1969); Smith, A Refresher Course in Cause, 12 La.L.Rev. 2, 15 (1952). Error in the determining motive, or principal cause, of a contract vitiates consent and invalidates the contract. Error as to a subsidiary motive has no effect upon the validity of the contract. Stack v. Irwin, 246 La. 777, 167 So.2d 363 (1964); Carpenter v. Skinner, 224 La. 848, 71 So.2d 133 (1954).
Some motives are readily discernible from the inherent nature of a sale. For example, an immediate end of the buyer is to acquire ownership of the thing sold. That motive characterizes the transaction. Other motives, not discernible from the inherent nature of the sale, rise to the status of principal cause only when the parties contract on that basis. Although the parties need not make the motive an express condition of the contract, it must appear from all the circumstances that the existence of the sale has been subordinated to the reality of the motive. The special motive must have been a constitutive element of the accord of wills. The reality of the motive becomes a tacit condition of the contract. LSA-C.C. Arts. 1825, 1826, 1827; Aubry & Rau, Droit Civil Francais: Obligations (An English Translation by the Louisiana State Law Institute) § 343a, p. 313; 3 Toullier, Droit Civil Francais (6th ed.) Title 3, Art. 1, §§ 40-42, pp. 26-28; Litvinoff, Louisiana Civil Law Treatise: Obligations § 220, pp. 394-395 (1969); Smith, A Refresher Course in Cause, 12 La.L.Rev. 2, 10-11 (1952).[4]
In these article on Cause, supra, Dr. J. Denson Smith, an eminent civil law authority, states:
"Considering the nature of the contract, realization of the principal cause or motive is understood to be the basis upon which consent is given and it therefore becomes a tacit condition of the contract. This is because the final and principal motive for assuming an obligation must lie in the obvious end being sought, for example, obtaining ownership, or use, or services, or conferring a benefit. If this cause fails, the will is vitiated and the contract falls. At the same time, if the particular motive is not discernible by the nature of the contract it is subsidiary and does not rise to the status of a tacit condition because the other party is not chargeable with knowledge that the contract is conditioned on its realization. To be effective as a condition, the parties must contract on that basis. An example of this may be found in the rule that error as to the value of the thing purchased and sold does not vitiate consent. Although a buyer may not have bought if he had known the true value of the thing, it should be presumed that he is taking his chanceand the seller is in like position unless the agreement is conditioned on value. All that the seller is required to know is that the buyer wants the thing being bought and sold, or supposedly so; why the buyer may want it, whether because of its supposed value or for any other reason is not the seller's concern if the parties do not contract on such basis. As the French writers put it, error will serve to invalidate consent only when it enters the contractual field. It does so tacitly if it relates to the principal cause, that is, the final and determining motive." [Footnotes omitted].
*823 The treatise of Aubry & Rau, Droit Civil Francais, supra, sets forth the principle as follows:
". . . [T]he error relative to the occasional motives or to the circumstances which may have induced one or both of the parties to contract, is a cause of nullity only where, according to the common intention of the parties, the reality of these motifs constitutes a condition to which they intended to subordinate the formation or the performance of the agreement." [Footnote omitted].
Finally, Toullier in Droit Civil Francais, supra, § 42, p. 28, states:
"It is by the manner in which the act is expressed, by the nature of the contract, by the object of the promise, finally by the circumstances, that one may determine what the determining motive has been, and whether the consent given has been subordinated to or conditioned on the reality of this motive as an implicit condition." [5]
In the present case, the transfer of ownership was effective. The buyer became the owner of the right to manufacture and distribute. The right conveyed is without defect. Hence, the immediate end that characterizes a sale generally was achieved.
M & M asserts, however, that its motive was to secure the manufacturing rights to a long-burning, high-output heater to sell to orchardists for freeze protection. It postulates that this motive was the principal cause of the contract, and the heater's failure to fulfill these requirements is an invalidating error. Finally, conceding the seller's good faith, it asserts that the error was induced by the seller's misrepresentation that the heater possessed the essential features to protect orchards from freezing.
Innocent misrepresentations may induce error when a purchaser justifiably relies upon them. When an error results from such non-fraudulent misrepresentations, the error invalidates the contract only if it bears upon the principal cause of the contract. LSA-C.C. Arts. 1823, 1825, 1845, 1847(2), 2529; Ganucheau v. Greff, La.App., 181 So.2d 854 (1966); Kardis v. Barrere, 17 La.App. 433, 136 So. 135 (1931); 12 La.L.Rev. 509.[6]
Cryer was an oil operator, with no special competence in heat engineering. Both lower courts found that he was in good faith and made no misrepresentations to the buyer.[7] We adopt this factual finding.
It is true that he transmitted a copy of the engineering report to the buyer when he delivered the model heater for testing. Under the circumstances, however, the transmission of the report cannot be considered as a representation of the seller that the heater met all the performance requirements of a marketable orchard heater. On the contrary, the record reflects that the seller intended that the manufacturer itself test the heater and rely upon its own skill and judgment as to the heater's performance. He gave the company ample opportunity to conduct its investigation by supplying it with a working model more than a month before the sale. Apparently, the manufacturer's tests consisted only of burning the heater for short periods for demonstration purposes. Under no sound legal theory, however, is the inadequacy of these tests chargeable to the seller. *824 See Henderson v. United States Sheet & Window Glass Co., 168 La. 66, 121 So. 576 (1929); Rocchi v. Schwabacher & Hirsch, 33 La.App. 1364 (1881).
The manufacturer was aware that the heater was newly developed. The purchase of manufacturing rights to it was speculative in some degree. One who expresses an unqualified will to purchase such rights should be bound accordingly unless the seller knows or should know that the purchaser's will is conditional. No basis for this knowledge appears in the record. Rather, it appears that, following the manufacturer's investigation and exercise of judgment, the seller reasonably contemplated an unconditional transaction. We find nothing in the contract or the circumstances under which it was formed to raise the manufacturer's expectations for the heater to the contractual level of principal cause.
In its well-written brief, the defendant relies upon several decisions of this Court dealing with error in contracts, including Stack v. Irwin, 246 La. 777, 167 So.2d 363 (1964); Carpenter v. Skinner, 224 La. 848, 71 So.2d 133 (1954); Overby v. Beach, 220 La. 77, 55 So.2d 873 (1951); and Pan American Production Co. v. Robichaux, 200 La. 666, 8 So.2d 635 (1942). We find these cases to be factually and legally inapposite.
We conclude, as did the Court of Appeal, that the sale is valid and that plaintiff's demand should be sustained.
For the reasons assigned, the judgment of the Court of Appeal is affirmed at defendant's costs.
HAMLIN, J., dissents in part with written reasons.
SUMMERS, J., dissents.
TATE, J., dissents in part and assigns written reasons.
HAMLIN, Justice (dissenting in part).
I respectfully dissent from the majority opinion and decree insofar as it affirms that part of the Court of Appeal decree which awarded plaintiff, Del Cryer, $6,250.00 with legal interest from judicial demand and costs.
As stated in the majority opinion, this suit was instituted by Del Cryer for the collection of royalties and attorneys' fees allegedly due under contract. Defendant answered and reconvened; averring redhibition, it prayed for rescission of the contract involved with reimbursement of $12,500.00 and payment of alleged expenses in the sum of $27,158.82.
The District Judge, the Court of Appeal, and the dissenting opinion of Judge Ayres accept the evidence of record to the effect that the accumulation of soot made the instant heater incapable of protecting orchards and tender vegetation. It, the heater, never performed as the Greene report, mentioned in the majority opinion, stated that it would. Mr. Greene himself testified that the heater would be of little use unless it was able to burn eight to ten hours at a sustained high heat output.
In my opinion, the evidence of record conclusively reflects that the experimental heater could not do the intended job, and the instant parties were unable to make corrections to eliminate the soot buildup. A non-descript heater was the result of continued efforts; defendant proceeded no further with production.[1]
The trial judge in his reasons for judgment, rejecting the parties' demands, stated *825 in part: "The facts established leave no doubt that the heater would not perform completely up to the standards set forth in the engineering report made by Mr. Greene. This report is in evidence as plaintiff's exhibit 8. The engineer's report was relied on by plaintiff and defendant as to the performance capabilities of the heater. Both plaintiff and defendant were in good faith in expecting the heater to live up to its representations in the Greene report. Both plaintiff and defendant were entirely in good faith in the entire matter because the heater operated perfectly in the short test that each made.
"A fair construction of the report is to state that it represents that the heaters will operate for 24 continuous hours, while producing 275,000 BTU's per hour, while, in fact, they will only operate satisfactorily three to five hours with the use of an additional tank, and then would accumulate soot up to the point to be unsatisfactory. * * *
"This defect made the heater so inconvenient and imperfect that it must be supposed that a buyer would not have purchased it had he known of the defect, although it would apparently still be competitive with or even outperform the competitive heater on the market called a `Salamander' heater, which produced 140,000 BTU's per hour for four or five hours and then had to be put out and re-lit. * * * When the two makes of heaters are compared, the instant heater does have some utility.
"Defendant has re-worked the dies and made extensive changes in the inventory received from the plaintiff and made new dies. * * * Defendant is not in position to return the same to the plaintiff for which reason the sale cannot be rescinded."
In my opinion, under the facts and circumstances of this case, justice does not demand the rescission of the instant contract and the return to M & M of the $12,500.00 it paid Del Cryer. Likewise, I do not believe that M & M is entitled to the return from Del Cryer of expenses it incurred after the negotiation of the instant contract on August 17, 1965. As I analyze the record, M & M was not as vigilant as it should have been. Equity aids the vigilant, not those who slumber on their rights. 30A C.J.S. Equity § 113, p. 32.
Article 1883 of the Civil Code recites that every contract has for its object something which one or both of the parties oblige themselves to give, or to do, or not to do. Herein, M & M obligated itself to manufacture heaters and pay royalties. The contract states, "As further consideration the said M & M Manufacturing Company, Inc., is to pay unto the said Del Cryer a royalty upon each and every unit manufactured or caused to be manufactured by the said M & M Manufacturing Company, Inc., the sum of $1.25 per unit." It further recites that M & M binds itself to manufacture and produce a minimum of 5,000 units during the first year of production.
Article 1891 of the Civil Code recites: "The object of a contract must be possible, by which is meant physically or morally possible. The possibility must be determined, not by the means or ability of the party to fulfill his agreement, but by the nature of the thing which forms the object of it." Herein, the object of the instant contract became physically impossible. M & M could not manufacture the 5,000 units. Under the articles of the Civil Code, reason dictates and justice demands that M & M not be assessed for the royalties prayed for by Del Cryer. I conclude that Del Cryer is not entitled to his demands.
Each case has a separate life of its own. The facts and circumstances of one case are not the facts and circumstances of another; each case must be decided on its own particular facts. Cf. 30 C.J.S. Equity § 89, p. 976. A court of equity is a court of conscience; it seeks to do justice and *826 equity between all parties; it seeks to strike a balance of convenience as between litigants; and it looks at the whole situation. It does not act unless justice and good conscience demand that relief should be granted, and acts only in accordance with conscience and good faith. 30 C.J.S. Equity § 89, pp. 978-979.
There is no case in the annals of Louisiana jurisprudence the facts of which are similar to those of the instant case. While both sides have cited numerous authorities, it is my view that they are not decisive of the instant case. I therefore look to Article 21 of the Revised Civil Code, the equity article in Louisiana. In addition to applying written law and jurisprudence to this matter, I would likewise apply equity.
My reasons are not the same as the trial court's reasons for its judgment; however, I reach the same conclusion as the trial judge.
I respectfully dissent in part.
TATE, Justice (dissenting in part).
The writer agrees with most of the analysis of the scholarly majority opinion. My main disagreement with the majority is in its implied holding that the ability to manufacture a workable orchard heater was not the principal cause or motive of the obligation to pay royalty. I find the royalty agreement to have a separate and distinct principal cause from the sales agreement.
The majority analyzed the contract as being solely a sale. Under my analysis, the contract between the seller Cryer and the buyer-manufacturer ("M&M") included at least two separate obligations: (a) the sale by Cryer to M&M for $12,500 of manufacturing rights and parts on hand pertaining to an orchard-heater; and (b) the agreement to pay $1.25 per unit royalty for each unit manufactured and to manufacture or produce at least five thousand units during the first year of production.
This contract thus produced a conjunctive obligation as defined by Civil Code Article 2063, with several connected objects contained in a single writing. As stated by the Article, "This contract creates as many different obligations as there are different objects." See also Civil Law Translations, Aubry & Rau, Obligations, Section 300 (LSLI translation, 1965). In my view, the "principal cause or motive," Articles 1824, 1825,[1] is different as to obligations (a) and (b), as set forth above.
As to (a), the sale of the manufacturing rights, I agree with the majority's determination that it should not be rescinded because of any error as to principal cause. Both parties realized that this portion of the transaction was in some respects speculative and that the refined development necessary for future exploitation depended to some extent upon the manufacturer's skill. The manufacturer here took his chances that he would not be able to perfect a workable product.
The sale of the right to manufacture the orchard-heater was therefore unconditional, with the buyer-manufacturer bound for the purchase price despite his inability, despite due diligence, to develop the orchard-heater into a merchantable product. The seller Cryer is thus entitled to retain the $12,500 purchase price, and the buyer M&M is not entitled to recoup his expenses incurred in attempting to perfect the product.
However, as to (b)the obligation to pay royalties of $1.25 per unit and to manufacture 5000 units during the first year of production, I believe there was an independent principal cause or motive: the underlying assumption that, in fact, the manufacturer could perfect a merchantable *827 unit, using due diligence (as, in fact, he could not).
Although there was no misrepresentation by the buyer, the engineering report furnished by him indicated that the orchard-heater was a workable product. Certainly, the seller believed that this was so.
In agreeing to manufacture 5000 units the first year, the principal cause or motive must have included the mutual belief that the manufacturer could produce a unit that would work and be merchantable. The parties could not have contemplated, in my opinion, that the buyer M&M would have to produce 5000 unworkable units or to pay royalty for the manufacture of an unusable product.
Therefore, I am unable to agree that the buyer unconditionally agreed to pay a royalty of $1.25 for 5000 units in the first year of production, whether or not it was possible to manufacture a merchantable orchard heater.
Under the agreement, the buyer paid $12,500 cash for the manufacturing rights and further agreed to pay "a royalty upon each and every unit manufactured [in]... the sum of $1.25 per unit." The agreement concluded: "It is further agreed and stipulated between the parties that the said M&M Manufacturing Company, Inc., [the buyer] shall use due diligence and good business practices in expanding the manufacture and distribution of said heater, and the said M&M Manufacturing Company, Inc., binds itself to manufacture and produce a minimum of 5000 units during the first year of production."
While the buyer unconditionally agreed (a) to pay $1.25 for each unit manufactured, (b) to use due diligence in expanding the manufacture and distribution, and (c) to manufacture and produce a minimum of 5000 units during the first year of production, it seems to me that the understood principal cause or motive for the obligation to pay royalty was that, using due diligence, it would be possible for the buyer-manufacturer to produce a merchantable orchard-heater. If it was able to perfect the orchard-heater, then the manufacturer was unconditionally bound to produce the minimum 5000 units during the first year and to pay the royalty of $1.25 per unit.
However, I am unable, in the absence of an express agreement to such effect, to hold as a matter of law that the motive or principal cause for an agreement to pay royalty for each unit manufactured does not include the ability of the manufacturer, using due diligence, to manufacture a workable and merchantable product. Since despite due diligence the manufacturer in the present case was unable to do so, this was an error as to a principal cause which invalidates the obligation to manufacture 5000 units during the first year and to pay royalties upon them. Civil Code Articles 1823, 1825.
Applicable here is Civil Code Article 1827: "... wherever the motive is apparent, although not made an express condition, if the error bears on the motive, the contract is void. A promise to give a certain sum to bear the expenses of a marriage, which the party supposes to have taken place, is not obligatory, if there be no marriage."
Although I differ with the majority opinion in this respect, I must admit the force of its reasoning that, since the principal cause for the sale agreement did not include the belief that in fact a workable orchard-heater could be manufactured, likewise the validity of the royalty agreement was not dependent upon such as a principal cause. Nevertheless, because of the difference between the obligations included in the sale of the right to manufacture the product, if perfectable, and the obligation to manufacture it and to pay royalty upon units manufactured (which must assume that the product was perfectable), I personally find no intellectual incongruity in an analysis contrary to the majority's.
*828 In short, although there was an unconditional obligation to pay the purchase price for the right to manufacture the orchard-heater and to use due diligence in developing and merchandising same, nevertheless the conjunctive obligation to manufacture 5000 units and to pay royalty upon these units manufactured during the year was conditioned upon the existence (or not) of the principal cause of that obligationthat the manufacturer, using due diligence, could produce a workable and merchantable product. Since this principal cause is shown not to exist, the royalty obligation should be held invalid because of error as to it.
I therefore respectfully dissent.

ON REHEARING
PER CURIAM.
Upon reconsideration of the issues, a majority of this court reaches the same conclusion as reached on our first hearing. We therefore adopt all the factual and legal conclusions of our original opinion and reinstate it and our original decree.
Original opinion and decree reinstated.
HAMLIN, C. J., dissents, adhering to the views expressed in his dissent to original opinion.
TATE, J., dissents and assigns additional written reasons.
BARHAM, J., dissents for reasons assigned by TATE, J.
TATE, Justice (dissenting).
The writer dissents in part and concurs in part. I adhere fully to the findings, legal analysis and statements of law of our original opinion in refusing to rescind the sale and in dismissing the reconventional demand praying for recission. I have reservations (as expressed in my dissent to the original opinion) to the majority holding that the ancillary minimum royalty agreement contained in the sales contract should not be rescinded on grounds of error in the cause. Nevertheless, I find it unnecessary to rest my present dissent upon a contrary view; because, for reasons to be stated, such minimum royalty agreement is unenforceable because its performance (unlike the validity of the sale itself) depended upon an implied condition which contemplated that it was possible to develop a merchantable heater.
The pertinent clauses of the "Sale of Manufacturing Rights" agreement executed between the parties are set forth in the footnote below.[1] As there set forth, for the purchase of the manufacturing rights, the manufacturer-buyer M & M unconditionally agreed to pay the seller Cryer the sum of $12,500 (Clause a) plus royalty of $1.25 for each unit manufacturer (Clause b). Additionally, by Clause c M & M agreed to use due diligence in expanding the manufacture and distribution of the heater andin order to effectuate this ancillary agreement of Clause c, it is important to notebound itself to manufacture a minimum of 5000 units during the first year of production.
*829 This sales agreement thus produced conjunctive obligations as defined by Civil Code Article 2063, with several connected objects contained in a single writing. As stated by the Article, "This contract creates as many different obligations as there are different objects." See also Civil Law Translations, Aubry & Rau, Obligations, Section 300 (LSLI translation, 1965). The minimum royalty agreement (Clause c) constituted an obligation separable in performance and enforceability from obligations of the buyer represented by Clauses a and b.
I disagree with the majority view that the $6,250 minimum royalties guaranteed by Clause c should be considered as part of the price to be paid by the buyeras if the sales price were $12,500 plus $6,250 minimum royalties. Instead, in my view, the agreement to pay such minimum royalties was, by terms of the contract, intended as a means of enforcing the ancillary agreement of the contract that the buyer use "due diligence and good business practices in expanding the manufacture and distribution of the heater." Clause c.
The thrust of Clause c is that the buyer must manufacture and market the heater as quickly as possible, consistent with good business practices (but to produce at least 5000 units the first year). However, the ability to manufacture a merchantable product was assumed to have existed. The agreement cannot have intended that the buyer manufacture at least 5000 heaters, whether or not it was possible to develop a heater that was economically competitive with other heaters on the market.
I should note that the record reflects that the buyer M & M used due diligence and did all possible to develop a heater as described in the patent and in the sale of manufacturing rights to it. Nevertheless, despite these efforts, it proved impossible to develop a merchantable heaterone that was economically competitive with preexisting products designed to fill the same function as the present heater.
The obligation to pay minimum royalties depended upon, as an implied condition, an uncertain event: the ability to develop a merchantable heater. This condition is implied from the nature of the contract and from the presumed intent of the parties. Civil Code Article 2026.[2] (This, incidentally, is undoubtedly also an implied condition for the basis obligation of the contract to pay $1.25 royalty for each unit produced (Clause b); no obligation to pay royalties under this clause existed unless, in fact, the manufacture of heaters was commercially possible.)
The minimum royalty agreement is therefore what is known in our law as a conditional obligationone which depended on an uncertain event, namely, the ability to manufacture a merchantable heater. Article 2021.[3] The obligation to pay the minimum *830 royalties never came into effect because the event upon which it depended never happened: by the exercise of all reasonable efforts, it was impossible for the obligor to develop a heater that it was economically feasible to manufacture.
Civil Code Article 1891 provides: "The object of a contract must be possible, by which is meant physically or morally possible. The possibility must be determined, not by the means or ability of the party to fulfill his agreement, but by the nature of the thing which forms the object of it." See Planiol, Civil Law Treatise, Volume 2, Sections 1006, 1007 (LSLI translation, 1959).
Thus, under traditional civilian principles, the unenforceability of the minimum royalty agreement can be ascribed not only to its dependence upon a suspensive condition which never came to happen, but also as resulting from the failure due to impossibility of the initial responsibility for performance. The Roman maxim, "Impossibilium nulla obligatio est (There is no obligation to do impossible things)", Broom's Legal Maxims 248 (1874), expresses the principle which Gaius stated as "If we stipulate for something to be given to us, which is of such a nature that this cannot be done, it is evident that such a stipulation is void by natural law * * *." Gaius, Digest 44.7.1.9 (Scott translation, 1932). See also 2 Ripert & Boulanger, Traite de Droit Civil 182 (1952). Some reliance might also be placed upon the modern civilian theorie de l'imprévisionthe power of the courts to hold negated an obligation when change of circumstance or impossibility voids the presuppositions or reasonable expectations of the parties, although not expressed, which formed an underlying basis for the agreement. Cf., Litvinoff, 1 Obligations, Sections 250, 297 (p. 538) (LSLI Civil Law Treatise, V 1, 6, 1969).[4]
In summary, the consideration for the sale itself contemplated that the development of a workable heater was somewhat speculative; the sale therefore is not invalidated by the impossibility to do so, since there was no error in the cause of the sale. On the other hand, the ancillary agreement within the saleto use due diligence in producing and marketing the product and to produce and pay royalties upon at least 5000 units the first yearwas entered into with the expectation that a merchantable heater could be developed; when this event proved impossible of fulfillment, the obligation to pay the minimum royalties upon 5000 units the first yearwhich depended upon this event which did not occurnever came into existence.
I agree with the district court conclusion that the plaintiff's demand for $6,250 minimum royalties should be dismissed.
*831 For these reasons, I respectfully dissent from the award to Cryer of $6,250 minimum royalties, although I concur with the dismissal of M & M's reconventional demand seeking recovery of the $12,500 price paid for the manufacturing rights.
NOTES
[1] The report recited: "Tests were performed on two identical, standard production heaters and extended over two 24-hour periods. All tests were performed in an unsheltered area with no provisions made for wind shielding. A standard recommended kerosene fuel (higher heating value of 19,900 Btu/lb.) was used for all tests."
[2] "Q. And you and Mr. May subsequently negotiated verbally and worked out the signed contract which was previously introduced in evidence, is that correct?

"A. Well, he told me he was very much interested in something, some product, and I told him to take the heater and take the engineer's report and if he found that it was something that he was interested in why I would be happy to make a deal with him and told him the conditions of the deal that I would accept, so he takes the heater and the engineer's report, and then I didn't have any other personal contact with Mr. May then for a couple of weeks."
. . .
"Q. Did you give Mr. May ample opportunity to run any tests that he may have desired prior to the time of the execution of the contract on August 17th, 1965?
"A. Yes, sir. Mr. May had the heater about 30 days prior to the time that we madethat we closed the deal.
"Q. Did you conceal from him any knowledge that you had with reference to the operational effect of the heater?
"A. No, sir, nothingI didn't conceal anything because I told Mr. May my occupation was an independent oil operator and that I wasn't an engineer but I did have an engineer's report on the heater and he could take it and do anything that he wanted to do with it, satisfy himself, and then if he thought that it was something he was interested in why I would be very happy to get with him and close the deal."
[3] The sale, captioned "Sale of Manufacturing Rights," conveyed the manufacturing and distributing rights with "legal warranties," that is, with such warranties as are imposed by law. It also conveyed the stock of parts and dies.
[4] The condition has also been described as "unvocalized" (8 Tul.L.Rev. 194), "undeveloped" (13 Tul.L.Rev. 363), and "implied" (Litvinoff, Louisiana Civil Law Treatise: Obligations § 212, p. 378 at f. n. 21 (1969).
[5] "C'est par la manière dont l'acte est concu, par la nature du contrat, par l'objet de la promesse, enfin `par les circonstances, qu'on peut juger quel a été le motif déterminant de celui qui consent, et si son consentement était subordonne a la réalité de ce motif comme a une condition implicite."
[6] In contrast, when error is induced by fraud, it need relate only to a "material part of the contract." LSA-C.C. Art. 1847(2); 12 La.L.Rev. 509; 33 Tul.L. Rev. 270.
[7] On original hearing, the Court of Appeal stated: "In this case there was no misrepresentation present." This finding remained undisturbed on rehearing.
[1] In answer, defendant averred: "Defendant admits that it has not manufactured 5,000 units of the Jet-Glo Multi-Purpose Heater, hereinafter referred to as the heater, but shows that it has manufactured 50 complete units and has on hand parts for approximately 500 additional units which have not been completed * * *."
[1] Civil Code Article 1825: "The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration without which the contract would not have been made."
[1] [a] "* * * The consideration for this sale is as follows: $12,500.00 cash paid to the said Del Cryer this date, who acknowledges the receipt thereof and grants acquittance and discharge therefor.

[b] "As further consideration the said M & M Manufacturing Company, Inc., is to pay unto the said Del Cryer a royalty upon each and every unit manufactured or caused to be manufactured by the said M & M Manufacturing Company, Inc., the sum of $1.25 per unit. * * *
[c] "It is further agreed and stipulated between the parties that the said M & M Manufacturing Company, Inc., shall use due diligence and good business practices in expanding the manufacture and distribution of said heater, and the said M & M Manufacturing Company. Inc., binds itself to manufacture and produce a minimum of 5000 units during the first year of production. * * *"
[2] Article 2026: "Conditions are either express or implied. They are express, when they appear in the contract; they are implied, whenever they result from the operation of law, from the nature of the contract, or from the presumed intent of the parties."
[3] Article 2021: "Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition."

Compare with Article 2020: "Simple obligations are such as are not dependent for their execution on any event provided for by the parties, and which are not agreed to become void, on the happening of any such event."
See also Article 2043: "The obligation contracted on a suspensive condition, is that which depends, either on a future and uncertain event, or on an event which has actually taken place, without its being yet known to the parties.
"In the former case, the obligation can not be executed till after the event; in the latter, the obligation has its effect from the day on which it was contracted, but it can not be enforced until the event be known."
And see also Article 2045: "The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed.
"It does not suspend the execution of the obligation; it only obliges the creditor to restore what he has received, in case the event provided for in the condition takes place."
[4] Also, in modern French law, a contract such as the present is termed a contrat de licence. 2 Roubier, Le Droit de la proprieté industrielle 260 (1954); Allart, Traité théorique et pratique des brevet d'invention 217 (3rd ed. 1911). According to French jurisprudence the licensor (breveté) warrants to the licensee (licencié): (a) the existence of the patent, and (b) the industrial feasibility, that is, that the thing can be manufactured. But the breveté does not warrant the commercial success. This means that, if the patent is real and it is possible to manufacture the thing, the commercial failure does not entitle the licencié to resolution of the contrat de licence. However, the licencié who does not exploit the patent because it is a commercial failure does not breach the contract and is regarded as having done as much as he could under the contract. Paris. Feb. 4, 1958, Ann.Prop.ind.1959, 224; Trib. gr.inst.Seine, Feb. 9, 1963, Ann.prop.ind. 1963, 385, both cited in Burst, Brevete et Licencié, leur rapports juridiques dans le contrat de licence 112-113 (1970).