532 So.2d 248 (1988)
FIRST ACADIANA BANK Plaintiff-Appellant,
v.
Donald BOLLICH Defendant-Appellee.
No. 87-672.
Court of Appeal of Louisiana, Third Circuit.
October 5, 1988.
Hank Hannah, Eunice, for plaintiff-appellant.
Jackson Burson, Eunice, for defendant-appellee.
Before DOMENGEAUX, KNOLL and KING, JJ.
KING, Judge.
The sole issue presented on appeal is whether or not the trial court erred in finding that the defendant had only intended to obligate himself as a cosignor on two promissory notes made by his son, and not as a continuing guarantor of his son's other loans, and for this reason was not liable to plaintiff on a continuing guaranty agreement when the son defaulted on other loans.
First Acadiana Bank (hereinafter plaintiff) filed suit against Donald J. Bollich (hereinafter defendant) to recover $20,000.00 allegedly owed to plaintiff as a result of defendant's continuing guaranty agreement given on behalf of his son, David Bollich (hereinafter David). Defendant's son, David, sought a loan from plaintiff and was advised that, because he was extended financially, a cosigner would be necessary to secure the requested $20,000.00 loan. Defendant signed what he thought was a document which made him a cosigner for his son's $20,000.00 loan when in fact the document which he signed was a continuing guaranty agreement for up to $20,000.00 for any of his son's obligations to plaintiff. David borrowed $20,000.00 and repaid it, but later defaulted on other loans totaling in excess of $20,000.00 and was adjudicated bankrupt. After the son's default, plaintiff contacted defendant and demanded he make good on his continuing guaranty agreement on behalf of David. Defendant denied liability claiming that he was in error in signing the continuing guaranty agreement. Plaintiff filed suit against defendant on his continuing guaranty agreement. Defendant filed a general denial and an affirmative defense of error in signing the continuing guaranty agreement *249 document. After a trial on the merits the trial judge rendered judgment dismissing plaintiff's suit. Plaintiff timely appeals. We affirm.

FACTS
Defendant, Donald Bollich, and his son, David Bollich, had both been customers of plaintiff, First Acadiana Bank, for several years and had established a good credit relationship with the bank. In August, 1984, David approached plaintiff and requested an additional $20,000.00 line of credit in order to complete his 1984 crop harvest. Leelen Lavergne, a loan officer at the bank, advised David that in order to obtain this additional line of credit it would be necessary to get his father, the defendant, to cosign for the loan. Mr. Lavergne requested defendant's cosignature as David's line of credit was already extended to the limit of his collateral which was pledged for previous loans.
On August 9, 1984, defendant and David met with Lavergne to discuss the details of the loan.
The defendant testified that he arrived at the bank and told Mr. Lavergne that he would have to prepare the loan papers immediately as defendant wished to return home as soon as possible to finish harvesting his crop. Defendant testified that he made it clear to Mr. Lavergne that he was there only to cosign for David's $20,000.00 loan and that after being presented with a document he quickly signed it, without reading it, and left the bank. He emphatically stated that at no time during the discussion was there mention of a continuing guaranty agreement and that he never intended to obligate himself for any of his son's other loans, but only for the $20,000.00 loan plaintiff agreed to make to David on that day. Defendant stated that he was aware of the difference between being a signer of a continuing guaranty agreement and being a cosigner for a loan as he had signed a continuing guaranty agreement for another son, Kirk, months earlier. Defendant also stated that he was never told or later notified that he had actually signed a continuing guaranty agreement until he received a demand letter on March 19, 1986 from plaintiff. This letter claimed that he was indebted to plaintiff for $20,000.00 because of the continuing guaranty agreement given on behalf of his son, David.
David testified that he was told by Mr. Lavergne that his father would have to cosign in order for him to obtain the loan. He stated that at the August meeting between the three parties that there was no mention of any need for a continuing guaranty agreement and that his father came in, signed the document presented, and left immediately. After his father's departure, he signed a note, dated August 9, 1984, for $16,000.00 and on September 10, 1984, went to the bank and signed a second note for the remaining $4,000.00 of the $20,000.00 loan plaintiff had agreed to make. Both of these notes on their face stated they were secured by the "Continuing Guaranty of Donald Bollich in the amount of $20,000.00." On the stand, David identified the two notes of $16,000.00 and $4,000.00, which were introduced on behalf of the defendant, and each reflected a "Paid" notation dated February 15, 1985, and December 6, 1984, respectively. David admitted he owed other sums to plaintiff and had been adjudicated bankrupt.
Mr. Lavergne, the loan officer for the transaction, only testified under cross examination, and stated that the following events occurred:
The defendant and his son, David, came into the bank, the continuing loan guaranty agreement was signed by defendant, and defendant left. Later, David signed a $16,000.00 note and a collateral loan agreement, pledging his father's continuing guaranty agreement and David's own prior crop pledge of $55,000.00 dated six months earlier, to secure the $16,000.00 note. Later, when David signed the $4,000.00 note David also signed another collateral loan agreement, pledging his father's continuing guaranty agreement and David's own crop pledge of $55,000.00 dated six months earlier, to secure the $4,000.00 note. On December 6, 1984, the $4,000.00 note was *250 repaid and on February 15, 1985, the $16,000.00 note was repaid.
On cross-examination, the plaintiff failed to question Mr. Lavergne and failed to call him to the stand on their case in chief. As a result of this omission, the plaintiff failed to present any evidence or testimony that the defendant knew he was signing a continuing guaranty agreement or at least had notice from Mr. Lavergne as to the nature of the instrument. Both James F. Dupre, Executive Vice-President of plaintiff bank, and Kenneth Paul Frye, Bank Cashier and Notary, also testified at the trial. Their testimony pertained mostly to bank rules and filing procedures of the bank's collateral loan files.
Frye's testimony, that he was present during the signing of the continuing guaranty and notarized it in the presence of the defendant, was surprisingly refuted by Mr. Lavergne. Lavergne stated that after all parties had left the bank, and hours later, Mr. Frye came into the office and notarized the document. While not crucial to the document's efficacy, this discrepancy does cast a shadow over the issue of the bank's credibility and practice.
In his well written reasons for judgment, the trial judge found that although the defendant did sign a continuing guaranty agreement document for $20,000.00 for David, he thought the document he was signing only made him a cosigner for the $20,000.00 loan plaintiff had agreed to make to David. The trial court found that there was sufficient error committed with respect to the cause that motivated defendant to sign the continuing guaranty agreement document. The trial court determined that the continuing guaranty agreement should be reformed to reflect defendant's intent to only guarantee the payment of David's $20,000.00 line of credit for David's $20,000.00 loan from plaintiff, and not as a continuing guaranty for all of David's other loans from plaintiff.
Both defendant and David testified that it was defendant's intent to obligate himself and only guarantee the payment of the $20,000.00 line of credit for the $20,000.00 loan plaintiff was to make to David. David made this loan and paid it off within a few months, leaving both defendant and himself free of any liability as to this transaction. Other than introducing the continuing guaranty agreement document signed by defendant, the plaintiff failed to present any evidence whatsoever that the defendant intended to do otherwise. The plaintiff did not make any effort to refute the testimony of defendant and David that there was to be no connection whatsoever between defendant's continuing guaranty agreement and David's other debts, either present or future, to plaintiff.
We adopt the following from the trial court's written reasons, which we find concisely sets forth the applicable law under the evidence and facts presented at trial:
"It is not every error that will support invalidation of a contract; it must be error on some point that was the principal cause for making the contract and may be `as to the motive for making the contract, to the person with whom it is made, or the subject matter of the contract itself.' Former C.C.art. 1923. In this case, the error, if any, is as to the motive for making the contract. The error, if any, in this case would have to be one of fact which `either proceeds from ignorance of that which really exists, or from a mistaken belief in the existence of that which was none.' Former C.C.art. 1821. The principal cause is the motive, and this means that consideration without which the contract would not have been made. Former C.C.art. 1825. Error in the motive will not invalidate the contract unless the other party knew it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it. Former C.C.art. 1826. In sum, the codal articles just discussed have been interpreted by our courts as requiring a meeting of the minds on the object of the contract. American Bank and Trust Co. v. Blue Bird Restaurant and Lounge, Inc., 290 So.[2d] 302 (La. 1974); The will of both parties must unite on the same point. Former C.C. art. 1798.
"`When the differences between the subjective (what is said orally) and the *251 declared will (the written instrument) are unintentional the right attitude consists in ascertaining whether the will as declared could have reasonably led the other party to rely on it and not in speculation as to which should prevail. This should not be understood as an assertation the declared will ought to prevail over the subjective one, nor as an adoption of the objective approach. On the contrary, it should be noticed that one party may be justified in his reliance only when the declared will of the other party is consistent with his presument intentions.' 6 Louisiana Civil Law Treatise (Litvinoff). Obligations, Section 135, p. 227."
* * * * * *
"The most convincing evidence of what was intended in this case came from Donald and David, and this evidence established that Donald only obligated himself for the $16,000 and $4,000 notes. Both said this was discussed at the bank, and neither was contradicted on that point. This question may be raised at this point. If Donald only intended to obligate himself for the $16,000 and $4,000 notes or $20,000, why did he sign a continuing guaranty? While there is no direct evidence on that point, the court can infer from the circumstantial evidence that Donald did not want to be bothered with returning to the bank again to further lend his name to complete the $20,000 loan which was made in increments of $16,000 and $4,000. Only $16,000 was lent to David when the continuing guaranty was signed. To insure that Donald's signature would also apply to the balance of $4,000 without his return to the bank to sign another instrument, the continuing guaranty was used. This would also explain why the continuing guaranty was never mentioned on any other note nor was it mentioned in the bankruptcy proceedings. Accordingly, the court finds error sufficient to vitiate consent has been established by clear and convincing evidence. Agurs v. Holt, 232 La. 1026, 95 So.2d 644 (1957).
The court finds that reformation of the continuing guaranty to reflect the true intent of the parties as the appropriate remedy in this case rather than annulment. See Wilco v. Levy, supra. Accordingly, the continuing guaranty is reformed to reflect that it applied to the $16,000 and $4,000 notes that were executed in 1984."
See Reconstruction Finance Corporation v. Mickelberry, 205 La. 463, 17 So.2d 628 (1944); Nugent v. Stanley, 336 So.2d 1058 (La.App. 3 Cir.1976);
The following Civil Code articles were in effect at the time of the signing of the continuing guaranty agreement.[1]
"Art. 1824. Reality of the cause
The reality of the cause is a kind of precedent condition to the contract, without which the consent would not have been given, because the motive being that which determines the will, if there be no such cause where one was supposed to exist, or if it be falsely represented, there can be no valid consent.
Art. 1825. Error as to motive
The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration* without which the contract would not have been made.
Art. 1826. Knowledge of motive by other party
No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.
Art. 1841. Invalidity of contract for error as to nature
Error as to the nature of the contract will render it void.
The nature of the contract is that which characterizes the obligation which it creates. Thus, if the party receives property, and from error or ambiguity in the words accompanying the delivery, believes that he has purchased, while he *252 who delivers intends only to pledge, there is not [no] contract."
In Cryer v. M. & M. Manufacturing Company, Inc., 273 So.2d 818 (La.1972), the Louisiana Supreme Court stated the following relative to error in the motive or cause of a contract:
"Error in the determining motive, or principal cause, of a contract vitiates consent and invalidates the contract. Error as to a subsidiary motive has no effect upon the validity of the contract." (Citations omitted.) Cryer at page 822.
We agree that the defendant's error in signing the continuing guaranty agreement document was in the principal cause and thus agree with the trial court's finding that, given the uncontradicted testimony of defendant and his son, it was established that the defendant intended to guarantee only the total of a $20,000.00 loan to David. The only other party involved in the transaction, Leelen Lavergne, the loan officer, did not even testify as to what were the intentions of the parties.
Considering the factual finding made by the trial judge, which we do not disturb, the trial judge reformed the defendant's continuing loan guaranty agreement to reflect the true intention of the parties as the trial judge found them to be from the evidence presented. In Rougeau v. State Farm Mutual Automobile Ins. Co., 262 So.2d 803 (La.App. 3 Cir.1972), this court stated that the party requesting reformation of a contract bears the burden, which must be overcome by strong and convincing evidence. We agree that the defendant met this burden and proved that the instrument, as written, did not reflect the true intention of the parties on the day it was signed and that the defendant's continuing loan agreement for $20,000.00 for all of his son's loans was signed in error.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are taxed to plaintiff-appellant.
AFFIRMED.
NOTES
[1] By Acts 1984, No. 331, Sec. 1, the principles embodied in these older Civil Code Articles have been restated in current Civil Code Articles 1948 et seq.