McCARTY CORPORATION

v.

PULLMAN–KELLOGG.

Civ. A. No. 80–505–A.

United States District Court,
M.D. Louisiana.

June 28, 1983.

Wesley W. Steen, Baton Rouge, La., for plaintiff.

Daniel Lund, New Orleans, La., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

In this diversity action, plaintiff, an insulation subcontractor, claims that the gener-

al contractor, Pullman-Kellogg, breached the contract, causing him damage, also claims that the contract should be nullified because of error as to the principal cause of the contract and further alleges fraudulent misrepresentations by the defendant causing damage. The defendant denies plaintiff's claims and asserts a counter-claim alleging that plaintiff failed to do certain work for which it was paid and further alleges deficient work in some respects. The matter has been tried to the court without a jury and the following will constitute the court's findings of fact and conclusions of law required by Rule 52, Fed. R.Civ.P.

## FINDINGS OF FACT

The following facts are undisputed and have been stipulated.

1) Plaintiff in this action is the McCarty Corporation, a Louisiana corporation having its principal place of business in Port Allen, Louisiana.

2) The defendant in this action is Pullman-Kellogg, Division of Pullman, Incorporated, is a Delaware corporation with its principal place of business in Houston, Texas.

3) McCarty is an insulation contractor that specializes in all phases of the engineering, distribution and application of commercial and industrial thermal insulation materials.

4) At the time that the subcontract which forms the subject matter that this law suit was awarded, McCarty had over twenty years experience in commercial and industrial insulation work.

5) McCarty has performed insulation work in such areas as Seattle, Washington, and San Juan, Puerto Rico; however, McCarty voluntarily limits most of its insulation work to the geographical boundaries of the state of Louisiana.

6) The gross volume of McCarty's insulation work has ranged between eight and twelve million dollars per year over the past five years.

7) Prior to McCarty's performance of the instant subcontract at the Shell-Norco facility located near Norco, Louisiana, McCarty had intermittently performed the work at the Shell-Norco plant for over twenty years.

8) As a result of McCarty's prior work experience at the Shell-Norco plant, McCarty was familiar with the working conditions at the Shell-Norco jobsite at the time it submitted its bid on the subject subcontract.

9) On three separate occasions prior to the subject subcontract, McCarty had contracted with the defendant, Pullman-Kellogg, for the application of industrial insulation materials.

10) The largest of the three prior subcontracts which McCarty performed for Pullman-Kellogg was the GO–1 job located at the same Shell-Norco facility on which the instant insulation subcontract work was performed.

11) The approximate dollar value of the GO–1 job was $3,100,000.00.

12) The GO–1 job was started in 1973 and completed in 1975.

13) McCarty performed the GO–1 job and each of its other two prior subcontracts with Pullman-Kellogg to Pullman-Kellogg satisfaction and none of the three prior projects resulted in litigation. McCarty submitted two claims for additional compensation on GO–1.

14) Pullman-Kellogg is engaged, inter alia, in the business of engineering and constructing industrial plants, including oil refineries.

15) On or about the sixth day of January, 1977, Pullman-Kellogg entered into a prime contract with the Shell Oil Company to perform certain work and services for Shell pursuant to an expansion program which Shell was conducting at its Norco manufacturing complex near Norco, Louisiana.

16) The prime contract is entitled:
Contract No. 152–01
Project OL–5 and Project OFH/S–2
OP–5 Expansion Program

**1344**

Norco Manufacturing Complex
Shell Oil Company

17) The expansion program is called "The OP–5 Expansion Program" and the prime contract is referred to as "OP–5."

18) Pursuant to the contract, Pullman-Kellogg was required to design, engineer, construct, furnish all material and equipment, and perform all home office services (including construction planning) for an olefins unit and its auxiliary facilities (called Project OL–5) and for a feed hydrotreater and sulphur plant (called Project OFH/S–2), both of which were portions of the OP–5 Expansion Program at Shell's Norco Manufacturing Complex.

19) Pullman-Kellogg was to be compensated for the work it performed and the services it rendered on a cost-plus basis.

20) It was pursuant to the OP–5 contract that Pullman-Kellogg awarded McCarty the thermal insulation subcontract which forms the subject matter of the instant action.

21) Shell is the owner of the 800 acre refinery facility near Norco at which McCarty performed certain insulation work pursuant to its subcontract with Pullman-Kellogg.

22) Shell is not a party to the law suit and has no pecuniary interest in its outcome.

23) In about May, 1978, Shell and Pullman-Kellogg discussed the placement of a subcontract for the insulation of the pipe and equipment which was being constructed in the following sections of the OP–5 Expansion Project:

a] The Ethylene Unit commonly referred to as the 01 Unit

b] The Feed Hydrotreater Unit (OFH) commonly referred to as the 02 Unit

c] The Butadiene Unit (BDU) commonly referred to as the 03 Unit

d] The Gas Hydrotreater Unit (GHT) commonly referred to as the 04 Unit

e] The Common Offsite Facilities commonly referred to as the 01 C Area, Offsite Interconnecting Yard

24) Shell desired an expedited placement of the insulation subcontract in order to take advantage of the depressed economic conditions then existing in the insulation industry.

25) Pursuant to discussions, Pullman-Kellogg recommended to Shell that a formal Invitation to Bid be issued by the end of May, 1978, requesting firm unit prices for the insulation work from the prospective bidders.

26) The bidders were to formulate their unit prices for the insulation materials based on the preliminary bill of materials which would be given to the bidders at the time the Invitation to Bid was issued.

27) The preliminary bill of materials which was to be compiled by Pullman-Kellogg was to indicate to the bidders:

a] The estimated scope of their works;

b] Pullman-Kellogg's anticipated schedule for field applications;

c] An estimate of the material quantities involved so that the determination could be made by the bidders for storage requirements.

28) Upon receipt of the bids, Pullman-Kellogg would apply the unit prices which it obtained from the bidders against the Pullman-Kellogg/Foster Wheeler's (Foster Wheeler was the design engineer for Units 03 and 04 of the project) estimated material quantities and the Unit costs would be extended.

29) These extended costs would be analyzed and a total projected cost would be developed for each bidder for each section of the project.

30) The bidder/bidders submitting the most attractive bids/bids (price and other factors considered) would then be awarded the various sections of the insulation work.

31) In order to calculate the actual contract price which the successful bidder would receive, the successful bidder would be required to perform his own bill of materials when the actual drawings and specifications became available and to apply this take-off against the agreed upon unit prices as set out in the subcontract.

32) The successful bidder would then submit these calculations to Pullman-Kellogg for auditing purposes.

33) The Engineering Division of Pullman-Kellogg would verify material quantities and the Procurement Division of Pullman-Kellogg would verify unit costs.

34) Upon the issuance of Pullman-Kellogg's approval of the successful bidder's calculations, the unit price subcontract would then be converted to a lump sum agreement.

35) By utilizing the plan described in the above paragraphs for placing the insulation subcontract, Shell and Pullman-Kellogg anticipated that they would:

a] Achieve early placement of the work because it could be placed before drawings and/or specifications for the 01, 02, 03, 04 and offsite portions of the OP–5 Expansion Project were even available; and

b] They would avoid having to spend numerous manhours in an effort to compile an accurate project bill of materials in advance of issuance of the Invitation for Bid, because the successful bidder would be required to perform his own bill of materials from drawings and specifications to be furnished after the contract award.

36) Pullman-Kellogg initially projected that the insulation work for the OP–5 Expansion Project work would cost $19,792,170.00 and take 594,000 manhours to complete.

37) Pullman-Kellogg's internal projection of manhours and cost per unit was as follows:

| Unit | Manhours | Costs |
|---|---|---|
| 01 Ethylene | 395,000 | 13,125,000.00 |
| 01 Common Offsites | 113,000 | 3,792,000.00 |
| 02 OFH | 40,000 | 1,335,500.00 |
| 03 BDU | 26,000 | 863,000.00 |
| 04 GHT | 20,500 | 676,670.00 |

38) Because of the large volume of work to be performed, Pullman-Kellogg recommended to Shell that the Invitation to Bid be issued only to the following experienced insulation applicators:

a] Anco Insulators-Baton Rouge, Louisiana

b] The McCarty Corporation-Port Allen, Louisiana

c] Branton Industries-New Orleans, Louisiana

d] Insul-Contractors, Inc.-Baton Rouge, Louisiana

e] Insulation Services, Inc.-Tulsa, Oklahoma

39) In August, 1978, Pullman-Kellogg estimated that the insulation work would cost $17,667,070.00 and take 594,500 manhours and that the common offsites would take 50,800 manhours.

40) On September 6, 1978, Mr. W.T. Smith of Pullman-Kellogg informed each of the above named insulation companies by Telex that Pullman-Kellogg was considering them as a possible source of supply and application of insulation materials on the OP–5 refinery expansion project, and requested that each company respond to a number of questions so that Pullman-Kellogg might better evaluate the qualifications of each of the prospective bidders.

41) On September 6, 1978, Pullman-Kellogg stated that preliminary cost estimates indicated the overall project scope to be in excess of fifteen million dollars ($15,000,000.00) and that over 500,000 manhours would be necessary to perform the required insulation work.

42) On September 6, 1978, Pullman-Kellogg further stated that it intended to obtain bids for both the complete project and also bids for division of work among a maximum of two or three insulation applicators.

43) On September 6, 1978, Pullman-Kellogg further states that even if it did select its option to split the work, each package could possibly average four to six million dollars and each package should take two hundred thousand manhours to complete.

44) McCarty received said Telex from Pullman-Kellogg and replied to the questions presented therein by both return telex and letter on September 7, 1978.

45) McCarty demonstrated an interest in supplying and applying the insulation which

would be required for the OP–5 expansion project.

46) On September 12, 1978, Pullman-Kellogg performed an in-house evaluation of the qualifications of major Insulation applicators in Louisiana.

47) Pullman-Kellogg's evaluation found McCarty's workmanship and quality of work to be good and Pullman-Kellogg recommended to Shell that McCarty be allowed to bid on the job.

48) At or about this same time (September-October 1978), Mr. M.R. McCarty (President of the McCarty Corporation) had oral discussions with Mr. W.T. Smith (Senior Purchasing Agent, Procurement Division of Pullman-Kellogg) regarding the nature and scope of the insulation work which would be required for the OP–5 refinery expansion program.

49) On October 9, 1978, Pullman-Kellogg transmitted to McCarty, and to various other insulation contractors, an Invitation to Bid on the insulation work which was required due to Shell's expansion of the Shell-Norco refinery facility.

50) Said insulation work was referenced in the Invitation to Bid as Kellogg Job No. 5249.

51) Each bidder was requested to submit a firm lump sum bid for the insulation of all equipment based upon the detailed equipment drawings and specifications which were made part of the Invitation to Bid.

52) Each bidder was also requested to submit a bid containing unit pricing only for the piping and instrument insulation.

53) Each bidder was to submit two sets of unit prices; one with and one without scaffolding.

54) Each bidder was to express the unit prices as "X" number of dollars per lineal foot of the various sizes of piping insulation.

55) The bidders were to formulate their unit prices based on both insulation specifications and Pullman-Kellogg's unchecked Bill of Materials.

56) Both the insulation specifications and Pullman-Kellogg's unchecked Bill of Materials were made part of the Invitation to Bid.

57) The Bill of Materials was furnished by Pullman-Kellogg for the purpose of helping the bidders prepare their unit price quotations for the piping as well as to develop costs for providing facilities for storage of materials.

58) McCarty knew that the preliminary bill of materials was incomplete and unchecked and was not an accurate indication of the total quantities of materials to be used on the project.

59) The preliminary bill of materials was to be used to determine the various pipe diameters and insulation thickness for which unit prices were calculated as well as to give a general idea of the work.

60) The preliminary bill of materials did not distinguish between off-site piping (01–C) and Ethylene piping (01–A & B).

61) McCarty could not have calculated the quantity of off-site piping from the preliminary bill of materials.

62) The written subcontract did not include the actual quantities of piping to be insulated.

63) Each bidder was told that the successful bidder/bidders would be awarded the piping/instrument work based on their unit prices as quoted.

64) Each bidder was also told that upon release of certain engineering data (drawings and piping isometrics) the successful bidder/bidders would be required to perform his/their own Bill of Materials take-off and apply it against the agreed upon unit costs and submit this data to Pullman-Kellogg for auditing purposes.

65) Upon the agreement of such audit with the subcontractor's take-off, the unit prices quoted would be converted to a lump sum figure and thus both Pullman-Kellogg and the insulation subcontractor could avoid taking the actual measurements of the piping in the field.

66) The bidders were further told that these same unit prices would be used for pricing adjustments to the scope of the work based on subsequent changes after the lump sum cost had been established.

67) Paragraph 7.1 of Part IV of the Invitation to Bid stated that it was Pullman-Kellogg's preference to award the entire scope of the insulation work to a single insulation contractor; however, it was reserving the option to award the work on the following basis:

a] Contract for approximately 35% of the Process area of the Ethylene unit identified as Block One (1) and Three (3), Plot A.

b] Contract for approximately 35% of the Process area of the Ethylene unit identified as Block Two (2), Four (4) and Five (5), Plot B.

c] Contract for Common Offsites approximately 30% of Job Section 5249–01 identified as Block Six (6), Seven (7) and Eight (8) as well as the entire Project Section 5249–02 Feed Hydrotreater, 5249–03 Butadiene Unit, and 5249–04 Gasoline Hydrotreater Unit.

68) The Invitation to Bid also contained a proposed tentative field construction insulation schedule, pursuant to which the successful insulation subcontractor was to perform the insulation work.

69) Pursuant to said proposed tentative schedule included in the Invitation to Bid, the work was to be completed as follows:

| | Unit 01 Ethylene | | Unit 01 Common Offsites | |
|---|---|---|---|---|
| | Start | Complete | Start | Complete |
| Equip. | 8/1/79 | 9/1/80 | 5/1/79 | 12/1/79 |
| Pipe | 2/15/79 | 2/1/81 | 3/15/79 | 12/1/79—90% |
| | | | 12/1/79 | 11/1/80—10% |

| | Unit 02 Feed Hydrotreater | | Unit 03 Butadiene | |
|---|---|---|---|---|
| | Start | Complete | Start | Complete |
| Equip. | 1/1/79 | 6/1/79 | 4/1/79 | 8/1/79 |
| Pipe | 2/1/79 | 9/1/79 | 5/15/79 | 12/1/79 |

| | Unit 04 Gas Hydrotreater | |
|---|---|---|
| | Start | Complete |
| Equip. | 6/1/79 | 12/31/79 |
| Pipe | 6/1/79 | 12/31/79 |

70) Between October 11, 1978, and November 11, 1978, Pullman-Kellogg issued ten Addenda to the Invitation to Bid either modifying and/or clarifying it as needed.

71) The Invitation to Bid at Paragraph 2.10 provides that "the Contractor and/or Owner will not accept any responsibility for the loss of, or damage to, any tools, equipment or property owned and/or rented by the Subcontractor."

72) The Invitation to Bid further provides at Section III, Paragraph 1.3 that "Oral explanations and interpretations made prior to the bid opening shall not be binding."

73) The Invitation to Bid further provides at Section III, Paragraph 1.4: "Should a bidder find discrepancies in or omissions from, the drawings or specifications, or be in doubt as to their meaning, he should at once notify the Contractor in writing who will send instructions to all on record as having drawings and specifications. The Contractor will not be responsible for any oral instructions."

74) The Invitation to Bid further provides at Section III, Paragraph 1.7, "Any estimate of volume of work set forth on drawings and/or specifications is not binding upon Contractor and is offered as an indication of scope of work only."

75) The Invitation to Bid further provides at Section III, Paragraph 18(c), "The Contractor shall have authority to stop the work whenever such stoppage is deemed necessary by Contractor/Owner to assure proper execution of the work and Subcontractor shall have no claim of any kind whatsoever for resulting damage."

76) The Invitation to Bid further provides at Section IV, Paragraph 4.0, that "Subcontractor and his subtrades shall cooperate with other Subcontractors' and Owners' personnel by arranging work to minimize interference obstruction, and delays and to avoid safety hazards and damage to the facilities."

77) The Invitation to Bid also contained the general terms and conditions of Pullman-Kellogg's Subcontract.

78) McCarty's original proposal was for all work on Pullman-Kellogg Job No. 5249, including areas 01–A and 01–B.

79) Areas 01–A and 01–B were originally scheduled to be completed in February, 1981.

80) The Invitation to Bid required all bidders to submit material prices for a period of four months beyond the scheduled completion date of the contract and to prepare overhead costs for an additional four months.

81) McCarty's original proposal provided the information requested in the Invitation to Bid for work to be performed after April, 1981 because its original proposal was for Areas 01–A and 01–B as well as 01–C.

82) James R. Godwin, the individual in charge of McCarty's estimating, prepared McCarty's proposal for the fixed price portion of the bid after studying the drawings and specifications attached to the Invitation to Bid.

83) The fixed price portion of the bid covered all equipment for all portions of the project plus certain piping in the Butadiene Unit (03 Unit) for which piping isometrics were available.

84) McCarty's fixed sum bid for materials and labor for each part of the subject project was as follows:

| | | |
|---|---|---|
| a] Plot A of 5249–01 | = | $ 881,009.00 |
| b] Plot B of 5249–01 | = | $1,375,991.00 |
| c] Plot C of 5249–01 | = | $ 23,626.00 |
| d] 5249–02 | = | $ 336,165.00 |
| e] 5249–03 | = | $ 743,616.00 |
| f] 5249–04 | = | $ 289,180.00 |

85) Mr. M.R. McCarty prepared the unit price portion of McCarty's proposal.

86) Said proposed field construction schedule showed that most of the work in Plot C was to be performed between the months of March and December of 1979.

87) The proposed tentative scheduled showed that much of the insulation work to be performed in the 01 Ethylene unit by the contractor who was awarded this portion of the insulation contract work was not scheduled to be performed until 1980 and 1981.

88) On November 17, 1978, McCarty submitted its proposal to Pullman-Kellogg for all work described in Pullman-Kellogg's Invitation to Bid.

89) McCarty's proposal contained a firm lump sum price for all equipment described in the Invitation to Bid.

90) McCarty's proposal contained unit prices for the piping and instrument insulation which was to be formally released by Pullman-Kellogg as the pipe and instrument drawings and isometrics became available.

91) McCarty submitted unit prices for all combinations of pipe and insulation sizes; the labor unit prices varied from $1.78/sf for 1″ insulation on ½″ pipe to $39.76/sf for 6½″ insulation on 48″ pipe.

92) On or before November 20, 1978, Anco Insulation (hereinafter "Anco") also submitted a proposal for the work described in Pullman-Kellogg's October 9, 1978 Invitation to Bid.

93) On or before November 20, 1978, Branton Insulation (hereinafter "Branton") also submitted a proposal for the work described in Pullman-Kellogg's October 9, 1978 Invitation to Bid.

94) On or before November 20, 1978, Insul-Contractors, Inc. (hereinafter "Insul-Contractors") also submitted a proposal for the work described in Pullman-Kellogg's October 9, 1978 Invitation to Bid.

95) On or before November 20, 1978, Insulation Services, Inc. (hereinafter "Insulation Services") also submitted a proposal for the work described in Pullman-Kellogg's October 9, 1978 Invitation to Bid.

96) Subsequent to November 20, 1978, Pullman-Kellogg began an in-house evaluation of the proposals which had been submitted to it by McCarty, Anco, Branton, Insul-Contractors and Insulation Services.

97) Pullman-Kellogg's in-house evaluation of the proposals revealed the following projected costs for McCarty's and Anco's insulation of the equipment and piping on Pullman-Kellogg Job No. 5249:

|            | Anco       | McCarty    |
|------------|-----------:|-----------:|
| **Plot A** |            |            |
| Equipment  | 901,607    | 1,023,137  |
| Piping     | 3,479,307  | 3,265,493  |
| **Plot B** |            |            |
| Equipment  | 1,335,986  | 1,375,677  |
| Piping     | 2,362,721  | 2,197,135  |
| **Total, Plot A & B** | 8,079,621 | 7,861,442 |
| **Plot C** |            |            |
| Equipment  |            |            |
| Offsites   | 33,947     | 23,626     |
| 02         | 333,438    | 336,165    |
| 03         | 549,361    | 411,893    |
| 04         | 361,284    | 289,180    |
| **Plot C** |            |            |
| Piping     |            |            |
| Offsites   | 664,287    | 589,666    |
| 02         | 647,880    | 570,858    |
| 03         | 1,207,222  | 996,008    |
| 04         | 340,073    | 318,208    |
| **Total, Plot C** | 4,137,492 | 3,535,604 |
| **Total Entire Project** | 12,217,113 | 11,397,046 |

98) Insul-Contractors was eliminated from further consideration due to various problems with its bid and because of other work which it had recently been awarded by Pullman-Kellogg at Pullman-Kellogg's Texaco job in Convent, Louisiana.

99) Insulation Services was eliminated from further consideration because the high cost of its bid made it non-competitive.

100) Branton Insulation was eliminated from further consideration because the high cost of its bid made it non-competitive.

101) McCarty was the low bidder for all insulation work included in Pullman-Kellogg Job No. 5249.

102) Because of the overall size of the job, Pullman-Kellogg decided that the entire project should not be awarded to McCarty.

103) Pullman-Kellogg decided to split Job 5249 for award to two insulation contractors.

104) Pullman-Kellogg decided that the section 01 Ethylene Unit (the work described in subsections A and B of paragraph 7.1 of Section IV of the Invitation to Bid) should be awarded intact to one contractor in order to consolidate schedules and simplify work areas.

105) Pullman-Kellogg determined that the remaining work in the common offsites, the 02, the 03 and 04 units (the work described in Subsection C of Paragraph 7.1 of Section IV of the Invitation to Bid) should be awarded separately to a different contractor.

106) Pullman-Kellogg decided to award the Section 01 Ethylene Unit (Plots A and B) to Anco.

107) Pullman-Kellogg decided that the work represented by the Section 01 common offsites, plus Units 02, 03 and 04, (Plot C) should be awarded to McCarty.

108) On February 28, 1978, personnel from Shell, Pullman-Kellogg and McCarty met at the Shell-Norco jobsite for a final review meeting.

109) At said February 28, 1979 meeting, Pullman-Kellogg informed McCarty that Pullman-Kellogg was considering McCarty for award of the Section 01 common offsites as well as Units 02, 03 and 04 (identified as Plot C in the Invitation to Bid).

110) McCarty confirmed that there should be no problem regarding lead time for materials as most manufacturers had large inventories due to the current state of the insulation industry.

111) Pullman-Kellogg informed McCarty that it expected the drawings and isometrics for the piping portion of Plot C to be released approximately as follows:

| Block 6, 7 & 8 | —approximately August 19, 1979 |
|---|---|
| 02 Unit Releases | —June, 1979 |
| F.W. 04 Unit | —85% of piping included in lump sum; remaining 15% of the drawings on hand for immediate issuance |
| F.W. 04 Unit | —Piping drawings expected within 45 days |

112) The field Construction Schedules were discussed as follows:

**Section 02 and Offsites**

|        | Start   | Complete |
|--------|---------|----------|
| Equip. | Mar. 12 | Sep. 15  |
| Pipe   | Jun. 16 | Sep. 15  |

| Section 03 | | |
|---|---|---|
| | Start | Complete |
| Equip. | Apr. 12 | Dec. 15 |
| Pipe | Jul. 15 | Dec. 15 |
| Section 04 | | |
| | Start | Complete |
| Equip. | Jun. 15 | Dec. 15 |
| Pipe | Aug. 15 | Dec. 15 |

113) Conversion of unit prices to a lump sum amount was also discussed.

114) It was agreed that McCarty would provide take-offs and conversion to lump sum not later than 30 days following receipt of a drawing release.

115) Pullman-Kellogg stated that in many cases drawing releases would be made in series, rather than all at once.

116) McCarty agreed to grant Pullman-Kellogg a 5% discount for any labor performed prior to September 1, 1979.

117) McCarty agreed to grant Pullman-Kellogg an 8% discount for material received or applied prior to January 1, 1980.

118) On March 5, 1979, Pullman-Kellogg sent McCarty a telex declaring Pullman-Kellogg's intent to award McCarty the following portions of Job 5249:

| | |
|---|---|
| Plot "C" | — Common Offsites (Blocks 6, 7 & 8) |
| Plot "C" | — Pullman-Kellogg Feed Hydrotreater (Unit 02) |
| Plot "C" | — Foster-Wheeler Butadiene (Unit 03) |
| Plot "C" | — Foster-Wheeler Gas Hydrotreater (Unit 04) |

119) The lump sum price for this work was established as follows:

| REQUISITION/ RFG NO. | UNIT | DESCRIPTION | L.S. AMOUNT |
|---|---|---|---|
| 5249–01–P98–102 | 01 | EQUIPMENT (HOT ONLY) | $ 23,626 |
| 5249–02–P98–102 | 02 | EQUIPMENT (HOT ONLY) | 336,165 |
| 5249–03–P98–102 (RFQ) | 03 | EQUIPMENT (HOT ONLY) | 411,893 |
| 5249–03–P98–102 (RFQ) | 03 | PIPING (HOT & COLD) | 331,723 |
| 5249–04–P98–102 (RFQ) | 04 | EQUIPMENT (HOT ONLY) | 289,180 |
| | | PRESENTLY ESTABLISHED (SUBTOTAL) | $ 1,392,587 |
| | | PLUS MOBILIZATION COSTS (WAREHOUSING) | 80,000 |
| | | PRESENTLY ESTABLISHED LUMP SUM | $ 1,472,587 |

120) Pullman-Kellogg's March 5, 1979 telex also confirmed the parties' agreement, reached at the February 28, 1979 pre-award meeting, that McCarty would begin immediate mobilization in order to start field work by approximately March 12, 1979.

121) Pullman-Kellogg's March 5, 1979 telex further confirmed that McCarty was to complete all field work by approximately December 15, 1979 in accordance with Pullman-Kellogg's filed releases of drawings and isometrics.

122) McCarty was informed by the March 5, 1979 telex that McCarty was to accept said telex as McCarty's authorization to proceed with the work set out in Plot C of Job 5249.

123) On March 12, 1979, McCarty did begin mobilization at the Shell-Norco facility in order to perform the insulation work set out in Plot C of the Invitation to Bid.

124) On April 26, 1979, McCarty and Pullman-Kellogg entered into Subcontract No. 5249–02–P98–102 which formally awarded Plot C (except Block 6) of the insulation work to McCarty.

125) The total firm lump sum cost of the contract work was set at $1,472,587.00.

126) The unit price which McCarty submitted to Pullman-Kellogg in its November 17, 1978 proposal were incorporated into the subcontract for purposes of pricing the piping and instrumentation work which was to

be released by Pullman-Kellogg as those items became ready for insulation.

127) The subcontract provided that McCarty was to start work on March 12, 1979 and complete same by December 15, 1979 in the following sequence:

Section 02 and Offsites

|  | Start | Complete |
|---|---|---|
| Equip. | Mar. 12 | Sep. 15 |
| Pipe | Jun. 16 | Sep. 15 |

Section 03

|  | Start | Complete |
|---|---|---|
| Equip. | Apr. 12 | Dec. 15 |
| Pipe | Jul. 15 | Dec. 15 |

Section 04

|  | Start | Complete |
|---|---|---|
| Equip. | Jun. 15 | Dec. 15 |
| Pipe | Aug. 15 | Dec. 15 |

128) The subcontract did not include Block 6 of the common offsites.

129) McCarty did not consider the deletion of Block 6 as cause to modify its unit prices for piping.

130) Paragraph 16 of the Subcontract General Terms and Conditions provides that the contract performance time was of the essence of the Subcontract. Paragraph 16 of the Subcontract General Terms and Conditions reads in pertinent part as follows:

16. PERFORMANCE TIME: Time is of the essence of this Subcontract and all actions taken by the parties hereto shall be taken to the end that the performance of this Subcontract shall be fully expedited.

131) Both the Subcontract form submitted with the Invitation to Bid and the Subcontract finally executed on April 26, 1979, by McCarty and Pullman-Kellogg contained, *inter alia,* the following provisions:

GENERAL TERMS AND CONDITIONS PARAGRAPH:

"3. DRAWINGS, SPECIFICATION: Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications and the drawings, or in case of discrepancies, omissions and/or errors, the matter shall be submitted immediately to Contractor for determination. * * "

"4. CHANGES IN SPECIFICATIONS AND DRAWINGS: Contractor reserves the right to make any changes in the specifications and/or drawings by giving written notice thereof to Subcontractor . . ."

"5. RESPONSIBILITY FOR WORK: Subcontractor has had full opportunity to examine the site of the work and determine the scope of the work involved and assumes full responsibility for the performance of the work in a manner adequate to meet the conditions encountered . . ."

"6. SUBCONTRACTOR'S EMPLOYEES: Subcontractor shall employ a competent superintendent who, on behalf of the Subcontractor, shall have complete charge of all work . . ."

"8. SCHEDULING WORK: Contractor represents that it, the Owner and other contractors and subcontractors may be working at the site of the work during the performance of this Subcontract. Contractor reserves the right to direct the Subcontractor to schedule the order of performance of this work in such a manner as not unreasonably to interfere with the performance of work by Contractor, the Owner, and other contractors or subcontractors. * * * "

"17. DELAYS AND EXTENSION OF TIME: If subcontractor is delayed in the progress of the work written notice thereof and of the anticipated results shall be given promptly to Contractor by Subcontractor. Failure to give such notice promptly shall be deemed sufficient reason for denial of extension of time by Contractor. Delays caused by Contractor or Owner or circumstances beyond the reasonable control of Subcontractor and not reasonably foreseeable by Subcontractor in time to be prevented shall, upon approval by the Contractor, be the basis for an extension of time of completion. Subcontractor shall not be entitled to and hereby waives any and all damages which it may suffer by reason of Contractor or Owner hindering or delay-

ing Subcontractor in the performance of the work."

"22. COMPENSATION AND PAYMENT: Subcontractor agrees to accept the specified compensation as full compensation for doing all work, furnishing all materials, and performing all provisions embraced in this subcontract; for all loss or damage arising out of the nature of the work as from the action of the elements or from any unforeseen or unknown difficulties or obstructions which may arise or be encountered in the prosecution of the work until its acceptance; and for all risk of every description connected with the work. * * * "

"23. EXTRA WORK: Subcontractor shall not be entitled to any compensation in addition to stated subcontract price for the performance of any work not required under this Subcontract, unless prior to the performance of such work, he shall have received Contractor's written authorization to perform such work and additional compensation therefore shall have been agreed upon in writing."

"28. SUBCONTRACT INCLUDES ENTIRE AGREEMENT: This Subcontract embodies the entire agreement between Contractor and Subcontractor. Subcontractor represents that in entering into this Subcontract it does not rely on any previous oral or implied representation, inducement, or understanding of any kind. Any changes in the provisions of this Subcontract, or in the attachments hereto made subsequent to the execution hereof, shall be made in writing and executed in the same manner as this Subcontract."

132) McCarty acknowledged that all trash removal was included in his responsibility under his Subcontract.

133) At the February 28, 1979, meeting, Pullman-Kellogg confirmed that it would release piping by systems in writing.

134) McCarty's bid provided extra compensation for piping work above twenty-two feet.

135) McCarty commenced work under the Subcontract at the jobsite in Norco on March 15, 1979, having begun mobilization on March 12, 1979.

136) Piping and equipment were released to McCarty for insulation by systems, which had to be made ready and tested as such before they could be released for application of insulation.

137) McCarty filed suit against Industrial Scaffolding, Inc., in the 19th Judicial District Court, No. 225–060, and obtained a judgment therein in the amount of $143,-835.00.

138) McCarty's project management (specifically Messrs. Quick and Elliott) remained the same throughout the project.

139) McCarty was performing an insulation subcontract for Chicago Bridge & Iron at the Shell, Norco plant at the same time it was performing the OP–5 subcontract.

140) During contract performance McCarty did not bevel insulation terminations at a 45° angle at valves and flanges.

141) Pullman-Kellogg maintains historical records of its productivity on construction contracts.

142) Pullman-Kellogg's productivity records are based on the productivity achieved on prior projects.

143) Pullman-Kellogg expresses its estimated and actual productivity in terms of cost factors.

144) A cost factor for an item of work is expressed as a decimal.

145) A cost factor of 1.0 means that the work is being performed at the anticipated level of efficiency. A cost factor of less than 1.0 means that the work is being performed for less manhours than the anticipated level of efficiency, i.e. is being performed more efficiently than anticipated.

146) Pullman-Kellogg used its productivity records to estimate the number of manhours needed to perform the various portions of Project OP–5.

147) Pullman-Kellogg used its productivity records to establish cost factors for areas 01 (Blocks 7 & 8), 02, 03, 04 on Project OP–5.

148) Pullman-Kellogg estimated a cost factor of 1.0 for Areas 01 (blocks 7 & 8), 02, 03 and 04.

149) Pullman-Kellogg labor categories B, C, D, E and M are the primary work activities which must be completed prior to the installation of insulation.

150) Pullman-Kellogg estimated a cost factor of 1.0 for Areas 01 (Blocks 7 & 8), 02, 03, and 04 for the following categories of labor:

| Category | Description |
|----------|-------------|
| B | Furnaces |
| C | Exchangers |
| D | Reactors & Converters |
| E | Process Vessels |
| M | Piping |

151) Pullman-Kellogg considered a cost factor of 1.10 (i.e. a loss of efficiency of 10%) to be acceptable for work on OP–5.

152) Pullman-Kellogg considered a cost factor at or above 1.15 to be an efficient use of labor on OP–5. (Powers Testimony, Exhibit P–48)

153) Pullman-Kellogg calculated the actual cost factors for Blocks 7 & 8, 02, 03, and 04 on a weekly and four weekly basis.

154) Pullman-Kellogg's cost factors in Area 03 prior to April, 1979 were between 1.0 and 1.20.

155) Pullman-Kellogg's overall cost factors in Area 04 prior to April, 1979 were between 1.0 and 1.08.

156) Pullman-Kellogg performed less than 10% of the work in Blocks 7 and 8 prior to April, 1979.

157) Under its original schedule with Shell, Pullman-Kellogg was to achieve mechanical completion in Area 02 by August 15, 1979.

158) Under its original schedule with Shell, Pullman-Kellogg was to achieve mechanical completion in Area 03 by December 1, 1979.

159) Under its original related schedule with Shell, Pullman-Kellogg was to achieve mechanical completion in Area 04 by December 1, 1979.

160) Under its original schedule with Shell, Pullman-Kellogg was to achieve mechanical completion in Block 7 by December 1, 1979 and all work in Block 8 by August 15, 1979.

161) Pullman-Kellogg commenced work in the field on January 15, 1979.

162) Pullman-Kellogg's forces worked concurrently with McCarty's forces in Areas 02, 03, 04 and Blocks 7 and 8. Lou-Con, Gaffney and O'Neil's forces worked concurrently with McCarty's forces in Areas 02, 03, 04 and Blocks 7 and 8.

163) Anco had a contract with Pullman-Kellogg to perform insulation in Area 01, directly adjoined to McCarty.

164) The size of Anco's contract was approximately $13,500,000. Anco was scheduled to start work on equipment insulation on June 1, 1979.

165) The proposed tentative schedule in Anco's contract showed that piping insulation was to start on January 1, 1980, and Block 6 on November 1, 1979.

166) McCarty and Anco both employed laborers from Asbestos Workers Local No. 53.

167) Anco employed an average of 200 asbestos workers per month during the period of December 15, 1979 through June 1980.

168) Between December 15, 1979 and July 18, 1980, McCarty lost all or a portion of 14 work days due to bad weather.

169) McCarty would not have lost portions of all of 14 work days due to bad weather if it had completed work on December 15, 1979.

170) Pullman-Kellogg had an obligation to schedule the work of the various contractors working on the OP–5 expansion project.

171) On June 1, 1979, McCarty's workers were prevented from insulating PV 1933 in the 03 Unit because the boilermakers were not finished with putting support clips on said pressure vessel.

172) On June 21, 1979, McCarty's scaffold erectors were prevented from insulating

PV–1922 by ironworkers erecting steel supports for an elevator.

173) On June 27, 1979, McCarty's workers were prevented from insulating PV–1917 because said pressure vessel was tied up with scaffold and tarps for fireproofing.

174) On July 9, 1979, McCarty's workers were prevented from insulating E–2174 because of Pullman-Kellogg's fireproofing operation.

175) On July 20, 1979, McCarty's workers were prevented from insulating PV–1926 because Pullman-Kellogg was working from McCarty's scaffold.

176) On October 9, 1979, McCarty's workers were prevented from insulating PV–1986 because the holes in the gratings on said vessel were not large enough to pass insulation.

177) On November 26, 1979, McCarty's workers were forced to stop insulation on the 16 × ½ line pipe test 18–03 on PV–1933 because the handrails had not been cut.

178) On February 25, 1980, McCarty's workers were prevented from completing insulating in Block 8 because there was scaffolding in their way. (Quick Testimony; Exhibit P–242a, page 84 of 99)

179) On March 13, 1980, McCarty's workers were prevented from insulating in the 02 Unit due to Shell's blowing steam.

180) McCarty's total earned revenue on the OP–5 expansion profit, including $212,186.92 retainage not yet paid, is $2,749,511.00.

181) McCarty's support craft costs for the subject subcontract included the labor costs for the carpenters, laborers, teamsters and warehouse personnel necessary to support the insulators.

182) As a result of ICI's abandonment of its scaffold erection contract with McCarty, McCarty was forced to arrange for substituted performance of the scaffold erection work.

183) Said substituted scaffold erection work was performed in part by McCarty but primarily by Scaffold Rental.

The parties have additionally stipulated to the precise release date and completion date of all drawings for both equipment and piping, as well as McCarty's reported manhours for each week from the week ending March 18, 1979 through the week ending July 6, 1980. Those facts will not be repeated here—they are in the record and, of course, are accepted by the court—but it is unnecessary to add 40 pages to these findings.

## ADDITIONAL FINDINGS OF FACT

184) The term "common offsite piping" as used in Paragraph 7.1 of Part IV, The Invitation to Bid, indicates piping connections for the various units involved and generally is understood to be long straight sections of pipe 20 to 25 feet off the ground.

185) At the pre-bid meeting in Houston, Pullman-Kellogg representative W.T. Smith and Duncan Kinchen told Mr. McCarty that they estimated the insulation contract would be between eighteen and twenty million dollars and that if all the work was not awarded to a single contractor, it would probably be split between two contractors on a one-third—two-thirds basis.

186) Mr. Kinchen also told Mr. McCarty that Anco Insulation was the only bidder capable of performing two-thirds or more of the insulation work, according to Pullman-Kellogg's analysis.

187) Mr. McCarty therefore concluded that if his company was awarded any portion of the work, it was most likely to be the one-third portion which was denominated as Plot C and which consisted of insulating the common offsite portion plus work in Units 02, 03 and 04 of the OP–5 expansion project.

188) Both Mr. Smith and Mr. Kinchen indicated to Mr. McCarty that one-third of the total contract work would probably be around $6,000,000.00.

189) Based on the information furnished to it by Pullman-Kellogg, specifically including the information in Paragraph 7.1 of Part IV of the Invitation to Bid specifically Paragraph C stating "Contract for common

offsites approximately 30% of job section 5249–01," the information that the total job was estimated at $18,000,000 to $20,000,000 and that if the contract were divided into three contracts, each could run approximately $4,000,000 to $6,000,000, McCarty prepared his bid.

190) McCarty concluded that the work in Plot C included a substantial amount of offsite pipe and he testified that he concluded that the common offsites would run from three and a half to four million dollars.

191) This contract included large vessels or tanks some of which were several hundred feet high.

192) It also included pipe simply connecting one vessel or tank to another and connecting this unit to other units of the refinery. This is the common offsite work usually consisting of long runs of straight pipe and it is less costly to insulate than pipe located in or upon a vessel which is sometimes several hundred feet off the ground.

193) Because McCarty believed that the majority of the work in Plot C consisted of this offsite piping, he reduced his usual labor charge by approximately 20% and he deliberately tailored his bid toward Plot C.

194) Subsequent to the award of the contract to McCarty, Pullman-Kellogg substantially reduced its estimate of the number of manhours and the cost of completing the work in Plot C. That information was not communicated to McCarty.

195) The details regarding estimated manhours and cost of the various portions of the work of Pullman-Kellogg's original estimate was not communicated to McCarty.

196) During the period of construction, Pullman-Kellogg, because of a shortage of welders and pipefitters, entered contracts with three local subcontractors, Lou-Con, Gaffney and O'Neil to perform such work in Areas 02, 03, 04 and Blocks 7 & 8; while the subcontractors worked in those areas, Pullman-Kellogg removed all of its welders and pipefitters.

197) The presence of these welders and pipefitters did not interfere with McCarty's performance of the insulation work and did not cause plaintiff to incur a loss of efficiency.

198) The completion schedule contained in the invitation for bids and the subcontract was extended several times for various units, one of which occurred before McCarty accepted this subcontract.

199) Pullman-Kellogg completed the "mechanical completion" of all the units upon which McCarty worked by the end of December, 1979, which was timely performance under its contract with Shell.

200) Delay in completion of the units meant that McCarty could not start insulating some units on as early a date as that contained in the construction schedule.

201) From the time McCarty went to work on the project, Pullman-Kellogg had released a sufficient amount of work to keep McCarty's forces busy and McCarty never ran out of work during the construction period.

202) From the standpoint of the owner, Shell, its primary objective was "mechanical completion" because the insulation of the units is not of critical importance; consequently, Shell was quite willing to allow a reasonable time for completion of insulation.

203) Although some insulation work was not released to McCarty as early as anticipated by the construction schedule, McCarty suffered no significant delay thereby, because McCarty always had work that his forces could accomplish.

204) Although McCarty, on a few occasions, was temporarily prevented from insulating certain equipment because other crafts had not quite finished, or for other reasons, this did not significantly interfere with McCarty's work, since his crews could have performed other productive work.

205) There were only nine documented instances where these temporary delays were encountered and on a construction project of that magnitude ($400,000,000) a

few such temporary delays are to be anticipated.

206) Neither party knows with any degree of certainty how efficiently its personnel performed the work.

207) Pullman-Kellogg admits that it accepted all of McCarty's work.

208) Pullman-Kellogg admits that it has retained the sum of $212,186.92, consisting of retainage under the contract.

209) The evidence establishes that McCarty's cost of materials and labor in performing the insulation work on the OP–5 expansion project was $3,028,272.00.

210) Both parties negotiated with each other and entered the subcontract in good faith.

211) The estimates of Pullman-Kellogg provided to McCarty relative to the type and scope of the work to be performed in Plot C were grossly in error.

212) Paragraph 21, entitled "Procurement Quantities" in the contract between Pullman-Kellogg and Shell provided in part as follows:

> In bidding, CONTRACTOR shall expose to the bidders the maximum quantities required by the work so as to obtain all price and service concessions due to volume.

213) Pullman-Kellogg has no records to support its counter-claim.

214) A Pullman-Kellogg employee Ershadi, testified that he estimated the number of flanges, valves and joints that should have been beveled (cut at a 45° angle), he estimated the number of bevels performed by McCarty and the number of bevels not performed; he also estimated what he thought the cost would be to perform that work and testified that it would cost some $96,000.

215) The evidence indicates that Shell has not demanded that bevels be accomplished and that Shell is not going to require that work to be done.

216) By change order, undated numbered 5249–02–P98–102AR, received in evidence as Exhibit P–273, McCarty's subcontract was reduced by the sum of $56,036.00 for "valve and flange labor" and by the sum of $13,616.00 for a "flange insulation on equipment and items-labor."

217) The same Pullman-Kellogg employee estimated that the cost of insulating uninsulated drain valves would be $8,000.00 and the cost of correcting certain caulking and waterproofing would be $15,000.00, that Pullman-Kellogg cleaned up areas that should have been cleaned up by McCarty at a cost of $5,000.00 and that Pullman-Kellogg dismantled scaffolding left by McCarty at an estimated cost of $8,000.00.

## CONCLUSIONS OF LAW

This court has jurisdiction because of the diverse citizenship of the parties and the fact that the amount in controversy exceeds $10,000.00. 28 U.S.C. § 1332(a).

At the close of all the evidence, the court orally granted defendant's motion for involuntary dismissal of Count III of the amended complaint which alleges that Pullman-Kellogg intentionally misled and thereby defrauded McCarty. That conclusion is hereby reaffirmed. There was no fraudulent conduct; both parties to this venture entered it in good faith, although each now impugns the good faith of the other.

■ Plaintiff claims that the defendant breached the contract by failing to timely provide drawings and access to the site, by obstructing McCarty's performance in several ways, including "overmaning" of the project, causing a reduction in McCarty's job efficiency and unreasonable delay in completion, all of which is alleged to have caused McCarty great damage.

There were a few instances where plaintiff's employees were temporarily prevented from working on a particular vessel or line because other crafts were engaged or for other reasons. Plaintiff has not shown that its forces could not have engaged in other productive work and the evidence establishes that plaintiff never ran out of work. Such temporary delays are to be anticipated from time to time on any large construction project and a well-organized

subcontractor should plan to cope with these instances. Plaintiff has not shown any breach of the contract by these isolated instances occurring over a period of a year.

There was a schedule for completion of the work which was amended before McCarty signed the subcontract. There were additional delays during completion of the project. Completion in different areas of the project was delayed by late delivery of materials and other reasons. The "mechanical completion" of the units contained in Plot C (McCarty's area) was attained according to schedule but obviously the units and piping must be erected before McCarty can insulate them and, since plaintiff did not complete all work until some time in July, 1980, it claims damages because of the delay. The invitation for bids put plaintiff on notice that there might be delays in completion of the project (see Subsection I of Part 7 which requires that the bidder submit firm prices for the period of the construction schedule plus four months and further indicated the possibility of an additional four months extension). The completion schedule was not a contractual guarantee; it was more of a goal that all intended to work toward and any experienced subcontractor ought to anticipate some delays in completion of a $400,000,000 construction project.

In the contract, McCarty specifically waived any claim for damages "by reason of Contractor or Owner hindering or delaying subcontractor in the performance of the work." (General terms, Paragraph 17) Plaintiff argues that this waiver covers only "reasonable" delays. The evidence does not establish that plaintiff was delayed beyond that anticipated by the contract. Indeed, some of the blame for plaintiff's failure to finish up its work before July, 1980, can be attributed to its own inefficiency. There was no breach of contract by reason of delay. Similarly, there was no breach of contract by reason of delay in releasing of the drawings for specific items to be insulated. Plaintiff has failed to establish that it suffered any damage by reason of such late releases. As has been noted several times, at all times during

construction, plaintiff had plenty of work available to be performed. The fact that it received some of the drawings later than scheduled did not interfere with its job performance.

Plaintiff has attempted to prove "overmaning" of the jobsite by evidence that Pullman-Kellogg during construction, let subcontracts to three local companies because of a shortage of welders and pipefitters and put them to work at the site alongside plaintiff's employees. Plaintiff called an expert witness who plotted efficiency curves for both plaintiff and Pullman-Kellogg. He testified at length. He opined that this "overmaning", together with Pullman-Kellogg's own lower than anticipated efficiency on the job, caused a reduction in plaintiff's job efficiency which resulted in great expense and damage to plaintiff. The witness was not convincing.

While I have no quarrel with the theoretical proposition that it is possible to introduce so many workmen upon the same jobsite at the same time that they interfere with each other's job performance, there is no reliable evidence in this record that that is what happened here. Pullman-Kellogg entered the subcontracts because of a shortage of welders and pipefitters and it removed its own welders and pipefitters from the area when the subcontractors went to work. Other than the expert's opinion, plaintiff has offered no evidence of actual interference in its job performance because of "overmaning." The expert's opinions were all based on arbitrary and assumed efficiency ratings for plaintiff and for Pullman-Kellogg. The productivity or efficiency rating is only as good as the estimates upon which it is based and the estimates here are not shown to have been reliable. There was no breach of the contract by reason of any reduction in McCarty's job efficiency.

Plaintiff's other claims of breach of contract do not merit discussion. Suffice it to say that plaintiff has failed to prove any breach by Pullman-Kellogg.

*Error in the Cause:*

Plaintiff alternatively claims that he should be allowed to nullify the contract with Pullman-Kellogg because of error in its cause. The claimed error is in Pullman-Kellogg's estimate of the scope of the work to be performed which led plaintiff to reduce the unit prices for piping.

The civilian concept of cause is, on occasion, equated to the common law concept of consideration. They are, however, two entirely different concepts and neither bears any relationship to the other. As the late Professor J. Denson Smith put it in an article entitled, "A Refresher Course in Cause," 12 Louisiana Law Review 2:

> The basic difference between civilian cause and common law consideration rests in these principles. In the civil law, agreement *without more* equals contract, as long as the agreement is a lawful one. In Anglo-American common law, agreement *plus consideration* equals contract. One theory subscribes to the view that a promise should be enforced because it is a promise, the other holds to the belief that a promise should not be enforced unless the promisor asks for and receives something in return for it.

> How the French came to hold their view is not difficult to discover. With the Romans, formality occupied great place in the law of contract. But canonical law, as early as the thirteenth century, taught respect for the will of man. This theory was echoed by the philosophers. Individual liberty and freedom became the rallying call of the French revolution. The drafters of the Code Napoleon recognized this philosophy and gave it life by exalting the will of the individual however expressed. Requirements of form were viewed in general as unnecessary obstacles to free expression. The power to bind oneself merely by expressing a will to do so was accorded full recognition. Given the required capacity, the parties with certain exceptions might contract as to all things, in the most extensive sense of the expression, corporeal or incorporeal, movable or immovable. All agreements legally entered into were given the effect of laws on those who made them. A promise was enforceable because it was a manifestation of the promisor's will to be bound, and no further reason was required.

In discussing the theory of cause, Professor Litvinoff, Louisiana Civil Law Treaties: Obligations, Section 217, page 388, notes the difference between actions of inanimate objects, and of men, i.e., the cause of the falling of a stone is that its support was removed; "But men, having a will do not act *because of,* but *in order to* attain an end. An act of the will without a final cause—a contemplated end—is as impossible as the falling of the stone without an efficient cause."

Professor Litvinoff further distinguishes the subjective motive which induces a person to make a promise from the end or object of the promise made. Although subjective motive may well be a decisive influence upon the will—a man may borrow to pay a debt, to speculate in the stock market or for other motives, and error in the subjective motive does not constitute grounds to nullify the consent:

> Thus the psychological motive that prompts each party to obligate himself is not a part of the accord of the wills. Whereas the creditor knows, or should know, the cause of the debtor's obligation, since this cause follows the nature of the contract, he is oftentimes ignorant of the debtor's motive for binding himself. This is so either because the motive is a matter of indifference for the creditor, or because the debtor prefers not to disclose it for fear that the creditor's knowledge may affect his—the debtor's—bargaining position. The motive, then, as distinct from the envisaged end, should not be considered as a part of the debtor's act of volition. Actually, it is anterior to the accord of the wills. (Id. Section 220 pp. 394 & 395)

The Louisiana Civil Code incorporates the concept of cause and of nullification of contracts where there is error in the cause of the contract.

Article 1896. By the *cause* of the contract, in this section, is meant the consideration or motive for making it; and a contract is said to be without a cause, whenever the party was in error, supporting that which was inducement for contracting to exist, when in fact it had never existed, or had ceased to exist before the contract was made.

The word "consideration" is not used in Article 1896 in the common law sense of something received for an obligation, but instead, relates to the reason (motive) for making a promise. *In re Canal Bank & Trust Company's Liquidation,* 178 La. 575, 152 So. 297 (1933). Other articles of the code expand upon the concept of cause. Article 1819 emphasizes that consent results from the free exercise of the will by each party and states that there is no consent where it has been produced by error or fraud. Article 1823 notes that not every error will invalidate the consent, "To have that effect, the error must be in some point which was a principal cause for making the contract, and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself."

Articles 1824 and 1825 further the requirement that the error must be in the cause:

Article 1824. The reality of the cause is a kind of precedent condition to the contract, without which the consent would not have been given, because the motive being that which determines the will, if there be no such cause where one was supposed to exist, or if it be falsely represented, there can be no valid consent.

Article 1825. The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and it means that consideration without which the contract would not have been made.

Article 1826 then makes it clear that subjective *motive* is not the cause of the promise and that error in the motive can invalidate the agreement only where the motive was communicated to the other party:

Article 1826. No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.

An example used by Professor Litvinoff is that of purchasing property for the purpose of operating a gambling casino; if that motive is not made known to the vendor then the sale is valid even though the authorities forbid the operation of the enterprise. *Litvinoff, supra,* at Section 220, p. 395. Article 1827 expands upon the last clause of Article 1826:

Article 1827. But whenever the motive is apparent, although not made an express condition, if the error bears on that motive, the contract is void. A promise to give a certain sum to bear the expenses of a marriage, which the party supposed to have taken place, is not obligatory, if there be no marriage.

Finally, Article 1881 provides that agreements made through error, violence or fraud are only voidable, not absolutely void.

Louisiana jurisprudence, particularly the more recent jurisprudence construes these articles of the code in accordance with the concept of cause, not consideration. In *Cryer v. M & M Manufacturing Company, Inc.,* 273 So.2d 818 (La.1972), the Supreme Court quotes Articles 1823, 1825 and 1826, and comments:

In these articles, cause is identified with motive. (citation omitted) Error in the determining motive, or principal cause, of a contract vitiates consent and invalidates the contract. Error is as to a subsidiary motive has no effect upon the validity of the contract. (citations omitted)

Some motives are readily discernible from the inherent nature of a sale. For example, an immediate end of the buyer is to acquire ownership of the thing sold. That motive characterizes the transaction. Other motives, not discernible from the inherent nature of the sale, rise to the

status of principal cause only when the parties contract on that basis. Although the parties need not make the motive an express condition of the contract, it must appear from all the circumstances that the existence of the sale has been subordinated to the reality of the motive. The special motive must have been a constitutive element of the accord of the wills. The reality of the motive becomes a tacit condition of the contract.... (273 So.2d at 822)

In this case McCarty claims that Pullman-Kellogg misrepresented the scope of the work to be performed by declaring that it estimated it to be eighteen to twenty million dollars, later that it might exceed fifteen million dollars, and that if the insulation contracts were divided there would be three approximately equal contracts of about $6,000,000 each. Some of these representations were in writing; some were oral. Defendant objects to parol evidence but it has long been held in Louisiana that error in a written contract may be proved by parol evidence. *Sylvester v. Town of Ville Platte,* 218 La. 419, 49 So.2d 746 (1950). McCarty also claimed that Paragraph 7.1(c) of Part IV of the Invitation to Bids misrepresented the amount of offsite piping to be insulated and that, relying upon these representations he reduced his unit prices for piping work. Although McCarty has claimed that these were deliberate, intentional and fraudulent representations, as noted previously, the court has found that there was no fraud and that both parties were in good faith. The court in *Cryer v. M & M Manufacturing Co., Inc., supra,* also commented:

"Innocent misrepresentations may induce error when a purchaser justifiably relies upon them. When an error results from such non-fraudulent misrepresentations, the error invalidates the contract only if it bears upon the principal cause of the contract...."
(273 So.2d at 823)

Here Pullman-Kellogg's representations were certainly innocent. It furnished all the information upon which McCarty was expected to formulate its bid. Both parties were aware that the piping drawings had not yet been prepared and that the precise scope and type of the work could not be calculated with precision. That was the reason Pullman-Kellogg requested unit prices on insulating piping and lump sum prices on insulating equipment. In order to prepare a bid, however, plaintiff needed to have some idea of the type and scope of the work to be performed. Plaintiff claims, and the evidence supports that claim, that common offsites, as used in the Pullman-Kellogg Invitation to Bid, indicates long runs of straight piping which is easier and therefore cheaper to insulate than pipe within a unit or upon a vessel a hundred or more feet in the air. Based upon the information furnished by Pullman-Kellogg, McCarty concluded that Plot C involved such offsite piping in the range of 3.5 to 4.5 million dollars. For that reason, McCarty reduced its unit price on piping. That this was a reasonable conclusion for McCarty to reach is confirmed by the stipulated fact that Pullman-Kellogg's own estimate originally was:

| Unit | Manhours | Costs |
| --- | --- | --- |
| 01 Common Offsites | 113,000 | 3,792,000 |
| 02 OFH | 40,000 | 1,335,500 |
| 03 BDU | 26,000 | 863,000 |
| 04 GHT | 20,500 | 676,670 |

The foregoing estimate for Plot C totals more than 6.5 million dollars for the work eventually awarded to McCarty, including nearly $4,000,000 of offsite piping. Although the details of this estimate were not communicated to plaintiff, it was undoubtedly the basis for the representation by Pullman-Kellogg that the total cost could run eighteen to twenty million dollars, that the individual subcontracts could run four to six million dollars each and that the "01 common offsites" represented about 30% of job section 5249–01. Subsequently, Pullman-Kellogg revised its estimate downward and this information was not communicated to McCarty either. As it turned out, there was significantly less work to be done in Plot C and, instead of 3.5 or 4 million dollars in offsite piping, there was only $330,000. Had McCarty known the

actual type and scope of the work to be performed in Plot C, it would not have entered the contract at reduced unit prices for piping. It was reasonable for McCarty to rely upon Pullman-Kellogg's representations as to the type and scope of the work to be performed and Pullman-Kellogg should have known that its representations would be relied upon. There was, therefore, error upon the principal cause of the contract, the type and scope of the work to be done. *Sylvester v. Town of Ville Platte,* 218 La. 419, 49 So.2d 746 (1950); *North Development Co., Inc. v. McClure,* 276 So.2d 395 (La.App. 2d Cir.1973).

■ Pullman-Kellogg argues, and correctly so, that its estimates of the work to be performed were not issued as guarantees; they were only estimates and neither party expected the estimates to be completely accurate. Nevertheless, the information was furnished for a purpose—otherwise it would not have been furnished at all. Paragraph 21, "Procurement Quantities", in the contract between Shell and Pullman-Kellogg requires that maximum quantities be furnished to the bidders in order to stimulate quantity discounts, which is precisely what McCarty provided. There is testimony to the effect that insulating subcontractors frequently reduce the price where the contract includes sizeable amounts of offsite piping. While Pullman-Kellogg should not be held to absolute accuracy of its estimates, it is not unreasonable to hold it to a reasonable degree of accuracy, where the information is furnished with knowledge that the bidder has no other information upon which to rely in making his bid. Had Pullman-Kellogg informed McCarty that the total work to be done in Plot C amounted to only 2.7 million dollars rather than four to six million dollars and that the offsite piping amounted only to $330,000 rather than 3.5 or 4 million dollars, McCarty would not have entered the contract at a reduced unit price.

■ Ordinarily, where a bidder is furnished complete plans and specifications, or the scope of the work is otherwise clearly set forth, the bidder runs the risk that he has accurately read the plans, understands the work to be performed and bids a price which he intends. *Cox-Hardie Co. v. Rabalais,* 162 So.2d 713 (La.App. 4th Cir.1964); *Reimann Constr. Co. v. Heinz,* 17 La.App. 687, 137 So. 355 (Orl.1931). Here, however, it was not possible for the bidders to accurately ascertain the type or scope of the work but they were asked to submit competitive bids and they had to base those bids upon the estimates furnished by Pullman-Kellogg. That information was in error and the error relates to the principal cause of the contract.

■ Defendant argues that, if there was error, it was McCarty's unilateral error in miscalculating the amount of work contained in Plot C and the type of work contained in Plot C and further argues that the contract may be annulled only for mutual error. The Louisiana jurisprudence is clearly against that position. *Quachita Equipment Rental Co., Inc. v. Trainer,* 408 So.2d 930 (La.App. 2d Cir.1981); *Scoggin v. Bagley,* 368 So.2d 763 (La.App. 2d Cir.1979); *North Development Co., Inc. v. McClure,* 276 So.2d 395 (2d Cir.1973); *Quachita Air Conditioning Inc. v. Pierce,* 270 So.2d 595 (2d Cir.1972); *Jefferson Truck Equipment Co., Inc. v. Guarisco Motor Co., Inc.,* 250 So.2d 211 (1st Cir.1971).

There being error in the principal cause, the contract must be annulled.

The usual relief granted when a contract is voided is to place the parties back in the positions they occupied before the contract. Here, however, that is impossible. Plaintiff claims that it is entitled to be paid for the work it performed for Pullman-Kellogg under a theory of quantum meruit. Plaintiff has established that its direct cost of material and labor in performing the insulation work was $3,028,272.00. McCarty claims that its average overhead or "general office expense" or "cost of goods sold" averaged 19.3% for the years 1979 and 1980 and that it has a profit rate of 10%. It therefore argues that it ought to recover the total of direct cost, overhead and profit, or $3,974,000. Since Pullman-Kellogg has accepted $2,749,511.00 worth of work (including

$212,186.92 of retainage which it has not paid) McCarty asks for the difference between the value of that accepted and the preceding total, or $1,224,490.00, plus the retainage.

"Quantum meruit", literally, "as much as he deserves," Black's Law Dictionary, 5th Ed.1979, is however, common law terminology which has crept into Louisiana where it has been applied in a variety of circumstances with no clearly articulated doctrinal basis. See Comment, Quantum Meruit in Louisiana, 50 Tulane Law Review 631 (1976), where the cases are collected and reviewed. Rather than consideration of common law quantum meruit, Louisiana's Civil Code provides a basis for recovery under the civilian concept of quasi contract, unjustified enrichment, as the Supreme Court recognized in *Minyard v. Curtis Products, Inc.,* 251 La. 624, 205 So.2d 422 (La. 1967). See also Tate, The Louisiana Action for Unjustified Enrichment: A Study in Judicial Process, 51 Tulane Law Review 446 (1976).

The articles of the Code dealing with quasi contracts, insofar as pertinent here, are:

Article 2292. Certain obligations are contracted without any agreement either on the part of the person bound, or of him in whose favor the obligation takes place.

Some are imposed by the sole authority of the laws, others from an act done by the party obliged, or in his favor.

The first are such engagements as result from tutorship, curatorship, neighborhood, common property, the acquisition of an inheritance, and other cases of a like nature.

The obligations, which arise from a fact, personal to him who is bound, or relative to him, result either from quasi contracts, or from offenses and quasi-offenses.

Article 2293. Quasi contracts are the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third person, and sometimes a reciprocal obligation between the parties.

Article 2294. All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. But there are two *principal kinds* which give rise to them, to wit: The transaction of another's business, and the payment of a thing not due. (emphasis supplied)

As Judge Tate suggests, 51 Tulane Law Review 459, Articles 2293 and 2294, do not purport to limit quasi contractual actions to negotioruim gesto and payment of sums not due. Here McCarty has furnished materials and services to Pullman-Kellogg, according to Pullman-Kellogg's specifications and Pullman-Kellogg's obligation to pay is founded upon a quasi contract, authorized, but not enumerated by Articles 2293 and 2294. The Code provides a specific measure of recovery for negotioruim gesto, Article 2299, and payment of a thing not due, Article 2302, but no specific measure of recovery is set forth for the other, unnamed, types of quasi contract.

The action of unjustifiable enrichment is founded upon the equitable principle that one person should not be enriched at the expense of another. As noted above, this civilian theory was first clearly articulated in Louisiana jurisprudence in *Minyard v. Curtis Products, Inc.,* 251 La. 624, 205 So.2d 422 (1967). There the Supreme Court, borrowing from the French action *actio de in rem verso,* set out the following elements which must be met before recovery may be had:

1. There must be an enrichment,

2. There must be an impoverishment,

3. There must be a connection between the enrichment and resulting impoverishment,

4. There must be an absence of "justification" or "cause" for the enrichment and impoverishment, and finally,

5. The action will only be allowed when there is no other remedy at law, i.e., the

action is subsidiary in nature or corrective in nature. See 205 So.2d at 432.

■ It is important to keep in mind that under the theory of unjustifiable enrichment, the court does not confect a new contract for the parties; rather the court's role is an equitable one which seeks to reimburse plaintiff only to the extent that his impoverishment has enriched the defendant. In some respects this is similar to the recovery allowed under the common law theory of quantum meruit but, the civilian notion of quasi contract—unjustifiable enrichment, provides a sound juridical basis both for determining liability and the measure of recovery. Often plaintiff's impoverishment and defendant's enrichment will equate, but that is not always the case. See e.g. *Brignac v. Boisdore,* 288 So.2d 31 (La. 1973); *Stelly Construction, Inc. v. Richard,* 401 So.2d 1214 (La.App. 3rd Cir.1981). Plaintiff always, however, bears the burden of proving the extent not only of his impoverishment but also, of the defendant's enrichment. *Brignac v. Boisdore, supra.*

Here McCarty contends that Pullman-Kellogg has been enriched to the extent that McCarty has been impoverished.

McCarty has proved actual direct cost of labor and material of $3,028,272.00. By submitting a copy of its financial statement, it argues that its general overhead expense for 1979 and 1980 averaged 19.3% and that its historic profit rate was 10% making a total of $3,974,000.00. McCarty's "revenue" from the Kellogg-Pullman was $2,749,511.00 (including the $212,186.92 of retainage not paid). The difference between the two figures is $1,224,490.00 which, McCarty claims, along with the unpaid retainage is the measure of his recovery.

■ A strong argument can certainly be made to support the view that these figures represent McCarty's impoverishment; the second element to be proved, as he must also prove a connection between plaintiff's impoverishment and defendant's enrichment. McCarty's recitation of his impoverishment is not sufficient, however, to establish the purported enrichment of Kellogg-Pullman. The defendant was enriched only to the extent that it unjustifiably received something of value at the expense of McCarty. That something of value was McCarty's services and materials which the evidence showed cost $3,028,272.00. The court concludes that Pullman-Kellogg has been enriched by McCarty's impoverishment to that extent. The defendant is entitled to credit against that sum for all amounts previously paid. Pullman-Kellogg has actually paid $2,537,342.08 (since it is still holding the retainage) and the difference between the amount it owes and the amount it has paid is $490,947.92.

■ While it is certainly conceivable that Kellogg-Pullman may have been further enriched at the expense of plaintiff, plaintiff failed to prove it. Plaintiff made no attempt to prove that his general overhead or his lost profit inured to Pullman-Kellogg's benefit. Plaintiff must prove not only a detriment to his own patrimony but the extent of the benefit to the defendant's patrimony and the extent of the detriment does not automatically metamorphise into a corresponding enrichment of the other estate.

This portion of plaintiff's case fails for lack of proof. There is evidence in the record that plaintiff's prices for materials and labor, totalling $3,028,272.00 was reasonable and represented fair value. There is no such evidence regarding plaintiff's overhead expense and his profit; that is to say, unless plaintiff can show that the defendant received the equivalency of his overhead and profit, he has failed to establish a corresponding increase in the defendant's patrimony. Under these circumstances, plaintiff's recovery will be limited to the direct cost of labor and material and, giving defendant credit for sums already paid, there will be judgment in favor of plaintiff in the amount of $490,947.92.

■ Plaintiff is entitled to interest upon that sum and, in other unjustified enrichment actions, the Louisiana courts have allowed interest from date of judicial demand until paid. *Minyard v. Curtis Products,*

*Inc.*, 251 La. 624, 205 So.2d 422 (1977); *Edmonston v. A—Second Co.*, 289 So.2d 116 (La.1974).

*The Counter-Claim:*

Defendant's counter-claim is based upon alleged breaches of contract. Since the contract in its entirety has been annulled, there can be no recovery for breach of contract. *First National Mortgage Corp. v. Manhattan Life Insurance Co.*, 360 So.2d 264 (La.App. 4th Cir.1978). Defendant has, however, the same quasi-contractual right to recover from McCarty that plaintiff has against defendant. If, indeed, defendant has paid for work that was not performed, then defendant may recover those sums under Articles 2301 through 2314 for payment of a thing not due. Defendant claims that the price it paid plaintiff included beveling (cutting the ends of the insulation at a 45° angle) at the flanges, valves and connections, in order that the bolts would be more readily accessible. McCarty denies that the specifications require this procedure (although its field superintendent admitted on cross examination that the specifications do so provide) but argues that the items were deleted by a change order. The change order in question does indeed show that "valves and flanges labor" and "flange insulation on equipment items-labor" were deleted and the total amount of $69,652.00 was subtracted from the amount otherwise due McCarty. Defendant concedes, in brief, that its proof of its cost is not precise, claiming $96,000 for the beveling that it says should have been performed. The court accepts the change order as "washing out" this item of dispute; consequently, defendant has no recovery on it and it is unnecessary to decide what amount, if any, of these costs would be recoverable under defendant's claim for unjustifiable enrichment.

The other items of the counter-claim are:

1. Failure to insulate drain valves  – $ 8,000
2. Failure to caulk and waterproof  – $15,000
3. Failure to clean up  – $ 4,000
4. Failure to dismantle scaffolding  – $ 8,000

All of these items are supported only by the estimates of Pullman-Kellogg's employee, both as to their existence and cost to repair. All costs were simple estimates. It is undisputed that Pullman-Kellogg accepted all of McCarty's work without making demand that these highly visible items be accomplished. Plaintiff claims that the acceptance precludes Pullman-Kellogg from asserting a claim for any defective workmanship except for nonobvious defects. In McCarty's claim against Pullman-Kellogg for unjustifiable enrichment, defendant ought not to be required to pay for work which did not meet its specifications (although if the work were shown to have value anyway, then defendant ought to pay for that enhancement of its estate). Pullman-Kellogg can not, however, recover damages for breach of a contract which has been annulled. *First National Mortgage Corp. v. Manhattan Life Insurance Co.*, 360 So.2d 264 (La.App. 4th Cir.1978). Moreover, Pullman-Kellogg has failed to prove any impoverishment of its estate by reason of these other claims. The Pullman-Kellogg witness admitted that Shell accepted the plant without requiring Pullman-Kellogg to perform the caulking that McCarty allegedly did not do. So Pullman-Kellogg clearly suffered no impoverishment on that score. As to the other claims, that Pullman-Kellogg provided the clean-up work and dismantling of the scaffolding that McCarty should have done, the court is of the view that Pullman-Kellogg ought not to be permitted to issue its acceptance, indicating its satisfaction with the work and then be allowed to raise these items which it had never called upon the plaintiff to perform. Bearing in mind that we have annulled the contract and we are dealing with an equitable doctrine, it is inequitable to allow Pullman-Kellogg to announce its satisfaction with McCarty's work without demanding that it provide the obvious clean-up required and the obvious dismantling of scaffolding, if it intended to make such demands. Accordingly, the acceptance of the

work will preclude Pullman-Kellogg from asserting these demands.

The defendant, having failed to establish any item of its counter-claim, the counter-claim will be DISMISSED.

For the foregoing reasons, there will be judgment herein in favor of plaintiff and against the defendant in the amount of $490,947.92 together with legal interest thereon from date of judicial demand until paid.